IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 108,599

STATE OF KANSAS,
*Appellee*,

v.

KASTON HUDGINS,
*Appellant*.

SYLLABUS BY THE COURT

1.

K.S.A. 22-3408(3) provides that a district court in a criminal case may limit voir dire examination by the defendant, his attorney, or the prosecuting attorney if the court believes such examination to be harassment, is causing unnecessary delay, or serves no useful purpose.

2.

The trial court has broad discretion in controlling voir dire. Deference to the trial court's discretion is the hallmark of voir dire issues in criminal cases.

3.

To warrant reversal of a case based on the rulings of the trial court limiting a defendant's voir dire examination of potential jurors, it must be shown:  (a) the trial court abused its discretion; and (b) prejudice resulted from the limitation.

4.

Allegations of judicial misconduct must be decided on the surrounding facts and circumstances. The party alleging judicial misconduct bears the burden of showing his or her substantial rights were prejudiced. If a proper and reasonable construction will render the conduct unobjectionable, it is not prejudicial.

5.

A defendant requesting a change of venue based upon pretrial publicity must satisfy the district court that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he or she cannot obtain a fair and impartial trial in that county. The defendant bears the burden to show prejudice exists in the community as a matter of demonstrable reality and to show the level of prejudice makes it reasonably certain the defendant cannot obtain a fair trial.

6.

A prosecutor's direction to the jury during closing argument that "you have to agree [the defendant] is not guilty of felony murder" before considering lesser included offenses, or "you only look at the lessers if he's not guilty of [felony murder]" is ambiguous, contrary to established caselaw, and constitutes prosecutorial misconduct.

7.

Failure to make a sufficient proffer of excluded evidence precludes appellate review of the exclusion because there is no basis for an appellate court to consider whether the trial court abused its discretion.

8.

Involuntary manslaughter while driving under the influence, K.S.A. 21-3442, is not a more specific crime than felony murder, K.S.A. 21-3401(b), based on the

underlying felony of fleeing and eluding a law enforcement officer, K.S.A. 8-1568(b). Therefore, a complaint is not defective because it charges the defendant with this felony murder theory rather than DUI manslaughter.

Appeal from Cherokee District Court; ROBERT J. FLEMING, judge. Opinion filed April 3, 2015. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Nathan R. Coleman*, county attorney, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.:  In July 2009, while fleeing police during a high-speed chase, Kaston Hudgins rear ended another vehicle, killing both occupants. A jury convicted him of two counts of first-degree felony murder and one count of fleeing or attempting to elude a police officer. In this direct appeal from those convictions, Hudgins challenges:  (1) time constraints imposed on defense counsel's voir dire; (2) admonishments by the district court in the jury's presence about the time defense counsel was taking during voir dire; (3) the district court's refusal to change venue; (4) prosecutorial misconduct; (5) the exclusion of evidence; and (6) the State's decision to charge felony murder rather than the more specific offense of involuntary manslaughter while driving under the influence. He also argues cumulative error denied him a fair trial. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A Cherokee County sheriff's deputy initiated a traffic stop after he saw a vehicle driven by Hudgins run a stop sign. Hudgins pulled over but sped away while the deputy was making initial radio contact with dispatchers. The uniformed deputy pursued Hudgins in a marked patrol car with its top, front, and back emergency lights activated and an audible siren in operation. The chase began about 9:15 p.m. While evading the deputy, Hudgins periodically turned his vehicle's headlights off and on, drove in the left-hand lane toward oncoming traffic, and passed at least one other vehicle on the shoulder. Vehicle speeds reached 120 miles per hour.

About 11 miles from where the pursuit began, Hudgins crashed into the rear of another vehicle at an intersection. His vehicle was estimated to be travelling about 98 miles per hour with the headlights turned off the instant before the collision. The two occupants in the second vehicle, a mother and her 13-year-old daughter, died. Hudgins was 22 years old at the time. His blood alcohol level was .15 grams per 100 milliliters of blood.

The State charged Hudgins with two counts of first-degree felony murder based on the underlying felony of fleeing or attempting to elude a law enforcement officer and one count of fleeing and eluding a law enforcement officer. A jury convicted him of all three counts. He was sentenced to two concurrent hard-20 sentences for the felony murders, plus a consecutive 6-month prison sentence for felony fleeing and eluding. Hudgins timely appeals. Jurisdiction is proper under K.S.A. 2014 Supp. 22-3601(b)(3) (life sentence).

## TIME CONSTRAINTS ON DEFENSE COUNSEL'S VOIR DIRE

The district court agreed with counsel to use an extensive, jointly prepared 18-page questionnaire that was mailed to prospective jurors in the weeks leading up to trial. This questionnaire covered such subjects as the possible influence of pretrial publicity, prospective jurors' biographical and family information; political and religious views; attitudes toward mental illness, alcoholism, law enforcement, and the criminal justice system; knowledge of the case and opinions of guilt; and relationships with potential witnesses and the victims.

More than 120 prospective jurors were summoned the first day of jury selection, which ultimately took about a day and half. From this larger group, the clerk initially called at random 42 names to sit in the jury box for voir dire examination. When one of those 42 was excused for cause, the clerk randomly picked a new person to replace the one excused. The State would then conduct an initial questioning of the new panelist to determine whether there was cause to strike, then defense counsel was free to resume examining any prospective juror in the box. The prospective jurors who had not yet been called into the jury box stayed in the courtroom and observed the proceedings.

The attorneys and the court ultimately questioned a total of 62 persons, from which a final group of 42 were passed for cause by both sides. After peremptory challenges, 12 jurors and 2 alternates were impaneled to hear the case, none of whom had been the subject earlier of unsuccessful defense motions to strike for cause. Approximately 60 prospective jurors, who were originally summoned on the first day, were never questioned, and the district court released them on the second day of the proceedings.

5

During the first afternoon of voir dire, shortly after the court had ruled on a for-cause challenge to a prospective juror made by defense counsel, the court commented to defense counsel, "I'm going to have to ask that you pick up the pace a little bit." It appears from the record this remark came after defense counsel was silent for about 3 minutes while reading a questionnaire before resuming questioning. Counsel responded, "I will your honor, I just had to review this."

Later, near the end of the first day while in chambers away from the prospective jurors, the district court asked defense counsel to "[g]ive me your best estimate of how much longer you think you'll be." Counsel responded he was not sure. Earlier, the court had advised that the panel appeared to be "getting very restless," adding, "I counted one time you went three minutes without saying a single word. That's when I interrupted you. And [the jury panel] is reading that. And they don't like that."

The district court further noted it had approved the questionnaire's use to facilitate the selection process, and defense counsel agreed, commenting that his voir dire preparation had consumed nearly 30 hours. The trial court then responded,

> "Well, I would expect with that kind of preparation that this would be snap, snap, snap, moving right along. And yet it almost leaves me with the impression that each of these is a new case study for you, that you're going through that questionnaire as though you haven't seen it before."

Shortly thereafter, the court emphasized, "I don't want to cut you off. I certainly don't want to prejudice your client. But I have an obligation to move this case along."

At about 5 p.m., the district court told the prospective jurors it had believed the jury was going to be picked by that time, but it was apparent selection could not be

completed, even if the session continued until 5:30 p.m. The court then called a recess until the next morning, adding it would "put some time limits on [defense counsel] to complete this." It remarked the jury would be picked by mid-morning the next day.

The following day, defense counsel continued questioning individual potential jurors for approximately an hour before the court called all counsel into chambers. Again outside the jury's presence, the court reminded defense counsel it had agreed months earlier to allow the detailed written questionnaires so the attorneys would have necessary information before voir dire. The court then criticized defense counsel's questions that morning, which focused on relationships with and attitudes toward law enforcement. The court said such questions were not relevant because the essential facts were not in dispute and it was unclear how police officer credibility would play a factor in this particular case. Defense counsel replied that his inquiries sought to discover inherent biases. The court responded:

> "But you have been at this for over five—yeah, little bit over five hours. And I think if you want to ask them a few—each one a question or two, okay.

> "But I said yesterday, at 10:30 you're done. And I don't want to just embarrass you by saying I'm taking this over. But if you've got a few more questions to ask, go ahead. And then if you have anybody you want to challenge for cause, do it so that we can conclude this thing."

The court then reconvened at 10:08 a.m., leaving defense counsel 22 minutes to finish. After additional questioning, defense counsel passed for cause the panel of 42 as then constituted.

Hudgins complains on appeal that the district court "cut-off otherwise searching questioning of potential jurors after less than five hours." He further argues: "[W]hen the

7

district court arbitrarily cut off defense counsel's reasonable and searching questioning of jurors regarding their prior opinions and biases, it similarly cut off any way to reliably guarantee that this jury was impartial." Hudgins claims the restriction on defense counsel's voir dire violated his rights under the Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights and that we should reverse his convictions and remand the case for a new trial "before an impartial jury." In his argument regarding the district court's denial of his motion to change venue, which we address below, Hudgins also suggests the lack of "full and liberal voir dire" prevented him from ensuring pretrial publicity did not impermissibly bias the jury pool.

*Standard of Review*

A district court "may limit [voir dire] examination by the defendant, his attorney, or the prosecuting attorney if the court believes such examination to be harassment, is causing unnecessary delay or serves no useful purpose." K.S.A. 22-3408(3). The trial court has broad discretion in controlling voir dire in criminal cases. *State v. Hayes*, 258 Kan. 629, 631, 908 P.2d 597 (1995). And because the appropriate scope and extent of voir dire varies from case to case, no fixed rules apply. Deference to the trial court's discretion is the hallmark of voir dire issues in criminal appeals. 258 Kan. at 631.

To obtain reversal under these circumstances, a defendant must demonstrate that (1) the district court abused its discretion in limiting voir dire; and (2) the defendant was prejudiced by that limitation. *State v. Pioletti*, 246 Kan. 49, 54, 785 P.2d 963 (1990). A district court abuses its discretion in limiting voir dire when the limitations imposed are arbitrary, fanciful, or unreasonable. *Hayes*, 258 Kan. at 631-32; see *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014) (abuse of discretion when no reasonable person would take same view, ruling based on error of law, or error of fact on which ruling was based not supported by substantial competent evidence).

8

*Discussion*

The purpose of voir dire is "to enable the parties to select competent jurors who are without bias, prejudice, or partiality." *Hayes*, 258 Kan. at 631. But in fulfilling that purpose, the trial court necessarily must reasonably maintain its authority to control voir dire when it deems it appropriate, even to speed up the process. *State v. Lockett*, 232 Kan. 317, 323, 654 P.2d 433 (1982) (citing *State v. Welch*, 121 Kan. 369, 374-75, 247 P. 1053 [1926]). The court also has discretion when deciding whether voir dire questioning is improper because it does not concern the jury's function in the case. *Lockett*, 232 Kan. at 323.

In these proceedings, the record shows the district court intervened to avoid what it perceived as unnecessary delay and needless questioning. Both are appropriate reasons to limit voir dire examination under K.S.A. 22-3408(3). Notably, Hudgins articulates no particular prejudice resulting from the district court's directive other than a conclusory argument that Hudgins' constitutional rights were violated. The closest Hudgins gets to discussing prejudice is to assert in his brief that the court's time limitations confined his ability to explore prospective jurors' "prior opinions and biases." And when asked about this at oral argument, Hudgins' counsel characterized the time limitations as arbitrary in light of the serious crimes being prosecuted and extensive pretrial publicity.

But the voir dire record discloses relatively little inquiry from defense counsel about pretrial publicity. In fact, defense counsel repetitively focused on other topics such as personal associations with law enforcement, familiarity with witnesses, experience with alcohol and driving, willingness to follow jury instructions and the evidence, defendant's right not to testify, burden of proof, and experience with the criminal justice system. It is difficult to attribute error to the district court based on a concern that it

9

prevented inquiry into pretrial publicity when defense counsel did not pursue that subject any more than he did. In other words, it does not appear counsel's inquiry into pretrial publicity was rushed or that counsel was otherwise prevented from developing further support for the motion to change venue during voir dire.

Similarly, it is difficult to glean from the voir dire record any unreasonable or arbitrary exercise of the court's discretion. Unfettered opportunity for limitless voir dire is not required. See K.S.A. 22-3408(3). And during the time allotted for questioning, the district court did not limit the subject matter of Hudgins' voir dire examination or the manner in which questions were posed. See *Hayes*, 258 Kan. at 633 (district court did not unduly restrict voir dire when defense was allowed to probe many subjects without interruption, and any interruptions restricted improper questioning and instructed jury on legal principles necessary to answer questions); *Jackson*, 234 Kan. at 86 (no undue restriction on voir dire when district court did not limit scope of exam, but required defendant to question panel as a whole, then follow up with individual jurors). Hudgins even continued questioning individual jurors who he had unsuccessfully moved to strike for cause—twice resulting ultimately in the excusal of the potential juror in question. The district court also gave fair warning of its intention to set a time limitation and allowed defense counsel to extend his examination into a second day.

Coupled with the extensive information available to counsel through the pretrial questionnaires, the record belies any assertion that the district court abused the broad discretion with which it was empowered when placing a time limitation on voir dire. See *Hayes*, 258 Kan. at 631. Moreover, even if we were to hold that the district court unreasonably pressed counsel to proceed by setting a mid-morning cutoff on the second day, there is no indication this prejudiced Hudgins. Hudgins does not contend on appeal, nor did he before the district court, that any time constraint adversely affected his ability to exercise challenges, for example. See *State v. Maxwell*, 151 Kan. 951, 956-57, 102

10

P.2d 109 (1940) (no prejudice demonstrated by restricting inquiry as to jurors' political and religious beliefs when defendant inquired if beliefs would preclude jurors from rendering impartial verdict and defendant did not contend he would have exercised peremptory challenges based on the prohibited inquiry). And Hudgins ultimately passed for cause the 42 panelists from whom the final 12 jurors and 2 alternates were chosen.

We hold the district court did not abuse its discretion—nor is prejudice shown—by prodding defense counsel to complete voir dire or setting the mid-morning time limitation on the second day.

REMARKS TO "PICK UP THE PACE"

Although Hudgins does not treat this as a separate issue in his brief, we do here because he suggests the district court made disparaging comments to defense counsel in front of the jury and implies this combined with the other jury selection issues prejudiced him. After reviewing the record, we disagree.

To put this claim in perspective, it is necessary to first look at what the defendant is referring to. There are two comments in question. The first, as noted previously, came after defense counsel was silent for about 3 minutes while reviewing a juror questionnaire as approximately 110 prospective jurors (both those in the box and those in the courtroom waiting to be called) looked on. At that point, the court said to defense counsel, "I'm going to have to ask that you pick up the pace a little bit." Counsel responded, "I will your honor, I just had to review this." The second is when the district court at the end of the first day of jury selection remarked to the panel and those in the courtroom:

11

"Well, I told my wife—she said, 'What time will you be home?' I said, 'We'll have the jury picked by 5, I can guarantee that.' I can tell you're worn out, all of you. And even if we went to 5:30, I don't think we're going to finish.

"So here's the plan. We're going to recess tonight; start at 9 in the morning. That means the gallery has to come back, too. But we will be—14 of you will have to stay and try the case, but the rest of you will be dismissed before noon tomorrow. I'm going to put some time limits on [defense counsel] to complete this, and we'll have the jury picked hopefully by our mid-morning break tomorrow morning."

*Standard of Review*

Allegations of judicial misconduct must be decided on the surrounding facts and circumstances. The party alleging judicial misconduct bears the burden of showing his or her substantial rights were prejudiced. If a proper and reasonable construction will render the conduct unobjectionable, it is not prejudicial. *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 (2002).

*Discussion*

When it is necessary to comment on counsel's conduct, especially in the jury's presence, the trial court should do so in a dignified, restrained manner; avoid repartee; limit comments and rulings to those reasonably required for the orderly progress of the trial; and refrain from unnecessarily disparaging persons or issues. *State v. Gadelkarim*, 256 Kan. 671, 676, 887 P.2d 88 (1994), *abrogated on other grounds by State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006).

In *Gadelkarim*, the court refused to find prejudice when the trial court told the jury not to blame defense counsel for the manner of jury selection—requesting 36 jurors to be

examined for cause. It held the comment might explain why the trial might start late or simply be an explanation of the mechanics of the trial process to the potential jurors. 256 Kan. at 678. Similarly, in *State v. Mahkuk*, 220 Kan. 74, 551 P.2d 869 (1976), the court discerned no prejudice from the trial court's allegedly continuous interruptions of counsel in voir dire and not allowing certain questions to be asked. The *Mahkuk* court noted the interruptions largely came in response to irrelevant questioning and held the district court was within its discretion to limit improper inquiry during the voir dire examination. 220 Kan. at 77; see also *Hayes*, 258 Kan. at 636 (rejecting prejudice claim when trial court referred to counsel's "adroit questioning").

In Hudgins' case, the district court's request that counsel "pick up the pace" occurred during what appears to be a lengthy pause between questions. And the court later explained in chambers that its comment was prompted by its observation that the panelists were getting very restless and did not appreciate the need for the silence. In context, the remark at worst is a mild warning that most certainly is within the proper exercise of a trial court's authority to control voir dire and avoid undue delay. It certainly does not appear demeaning. We further note Hudgins does not claim the court's tone was inappropriate or unprofessional, nor could we infer this from the record. See *Hayes*, 258 Kan. at 636. As such, the court's comment cannot reasonably be characterized as either improper or prejudicial.

The district court's explanation to the 100 or more prospective jurors that defense counsel would have some time limitations on the second day of voir dire also does not appear improper, unprofessional, or prejudicial. The comment was made in the setting of informing those who were making themselves available for jury service what to expect in order to manage their time and affairs. And while it can be acknowledged the time restriction was aimed at the defense because the State had already passed the 42 panelists

13

for cause, the district court's remark did not appear to disparage either counsel by casting blame upon or criticizing them.

In sum, a careful review of the voir dire examination record does not reveal the court's comments were disrespectful or implied partiality toward one counsel or party or the other. Like the comments in *Gadelkarim*, *Mahkuk*, or *Hayes*, the statements at issue here may be explained as the district court acting within its discretion to control the pace of voir dire and conveying information about the manner in which the case would proceed based on its legitimate concern for the trial participants. We hold this challenge to the proceedings to be without merit.

## CHANGE OF VENUE

Hudgins argues the district court erred by denying his motions for change of venue from Cherokee County based on pretrial publicity. He contends this publicity, coupled with his challenges to his voir dire examination, deprived him of his Sixth Amendment right to an impartial jury. Again, some additional background is necessary.

Prior to trial, Hudgins sought a change of venue, alleging media coverage had "been so great that it . . . produced so much prejudice in the community that the likelihood of . . . receiving a fair and impartial trial is doubtful." In that same motion, Hudgins requested an order for expert services to procure a public opinion poll to support the motion. The State objected. The district court denied both requests, citing *State v. Krider*, 41 Kan. App. 2d 368, 373-74, 202 P.3d 722 (2009), in which the Court of Appeals held the same district court had not abused its discretion in denying a venue change after discerning from the jury selection process no prejudice in the venue.

14

Hudgins later renewed his venue motion in reaction to publicity surrounding a civil bench trial arising from the collision. In large part, Hudgins relied on newspaper quotes from the civil trial judge's ruling that Hudgins was the only party at fault in the collision and the media's dissemination of facts such as Hudgins' speed and blood alcohol level at the time of the collision. Hudgins attached several area newspaper articles about the civil trial and its resulting $5.5 million judgment. Hudgins further alleged in a follow-up pleading that a review of 90 jury questionnaires sent out in preparation for a scheduled June 21, 2011, trial revealed 75 percent of respondents "indicated a strong bias against [Hudgins] or some other reason that would make service as a juror suspect on this panel."

On June 15, 2011, the district court heard the renewed motion. During that hearing, the court indicated it had mailed 200 questionnaires to prospective jurors. Ultimately, the district court took the motion under advisement until it could see how jury selection went. Shortly thereafter, the district court granted Hudgins' motion to replace his trial attorney, appointed new counsel, and continued the trial date. Following another postponement, the district court set trial for March 13, 2012.

In preparation for that March trial, the same questionnaire was sent to a different group of prospective jurors. The record contains 115 questionnaires received in February and March 2012. Of those, 83 indicated they had heard about the case after being apprised of the charges, names of the defendant and victims, and date of the alleged crimes. Fifty-five reported having formed an opinion as to Hudgins' guilt or innocence as a result.

But of the 12 jurors and 2 alternates eventually impaneled, 6 had reported not hearing about the case prior to filling out their questionnaires. Five others reported having heard about the case or believing they had heard about the case but denied forming any opinions about it. Three others reported having formed opinions about the case, but

15

during voir dire two of those agreed they could reach their verdict based on the evidence and instructions presented at trial, while the other recanted his prior opinion about Hudgins' guilt based on what he had learned during voir dire. And as noted earlier, of the more than 120 prospective jurors summoned, only 62 were questioned by counsel before 42 of those were passed for cause by both sides prior to exercising peremptory challenges.

After jury selection was complete, the district court denied the renewed motion to change venue it had kept under advisement. It reasoned that each juror said he or she could serve fairly and impartially and noted that each who had expressed preconceived notions of guilt "backed off those notions" and said they could render a verdict based on the law and the evidence.

*Standard of Review*

"A defendant requesting a change of venue based upon pretrial publicity must satisfy the district court that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he or she cannot obtain a fair and impartial trial in that county. The defendant bears the burden to show prejudice exists in the community as a matter of demonstrable reality and to show that the level of prejudice makes it reasonably certain that the defendant cannot obtain a fair trial." *State v. Roeder*, 300 Kan. 901, Syl. ¶ 1, 336 P.3d 831 (2014).

A constitutional claim that pretrial publicity requires a change of venue can arise in two contexts:  presumed prejudice and actual prejudice. *State v. Longoria*, No. 108,333, 2015 WL 968385, at *12 (Kan. March 6, 2015). Hudgins bases his venue challenge on an "actual prejudice" argument, focusing on the factors enumerated in *State v. Higgenbotham*, 271 Kan. 582, 23 P.3d 874 (2001). See *Roeder*, 300 Kan. at 908-09 (employing actual prejudice analysis because defendant relied on *Higgenbotham* factors

16

and did not claim presumed prejudice). Under the actual prejudice analysis, the district court's denial of a venue change is reviewed for abuse of discretion. *Roeder*, 300 Kan. at 909. Defendant's burden is a "steeply uphill battle." 300 Kan. at 909. The defendant must prove community prejudice was a "'demonstrable reality'" such that it was "'reasonably certain he or she could not have obtained a fair trial.'" 300 Kan. at 910 (quoting *Higgenbotham*, 271 Kan. at 591-92).

*Discussion*

To determine whether actual prejudice existed, this court considers nine factors: (1) the degree of publicity circulated through the community; (2) the degree the publicity circulated through areas to which venue could be changed; (3) the length of time from the dissemination of the publicity to the trial date; (4) the care exercised and ease encountered in jury selection; (5) the familiarity with publicity and its resultant effects upon prospective jurors or trial jurors; (6) challenges exercised by the defendant in jury selection, both peremptory and for cause; (7) the connection of government officials with the release of the publicity; (8) the severity of the offense charged; and (9) the particular size of the area from which the prospective jurors are drawn. 300 Kan. at 910 (citing *Higgenbotham*, 271 Kan. at 592). For clarity, we address each factor in turn.

*Degree of publicity through the community*

The publicity regarding Hudgins' criminal charges appears to have been significant, especially when it combined with the civil bench trial results. Most prospective jurors indicated hearing about the deaths or were at least vaguely familiar with the family, the parties, or witnesses—although it is difficult to determine from the record whether this resulted from the relatively small community affected or the publicity.

*Degree of publicity in areas to which venue could be changed*

Hudgins did not present evidence about the degree of publicity circulated through areas to which venue could be changed. He excuses this by arguing the district court's denial of his request for fees to conduct a poll makes it impossible for him to satisfy this showing and that his failure should not be held against him for that reason.

*Time between the publicity and the trial date*

The trial occurred approximately 31 months after the fatality collision, but only 11 months after the civil case and its attendant publicity. And the voir dire examination record shows a few jurors had seen some publicity about the upcoming trial a day or so prior to being questioned.

*The care exercised and ease encountered in jury selection*

As noted, given the more than 120 persons summoned for voir dire, it appears it was comparatively simple to get 42 passed for cause by both sides before moving to peremptory challenges. And of the three jurors ultimately picked who had expressed initial opinions about defendant's guilt in their pretrial questionnaires, defense counsel had not moved to strike any of them for cause. In addition, the district court's use of an extensive questionnaire to assist with jury selection demonstrates exceptional care in the process.

*Familiarity with publicity and its resultant effects*

Again, the publicity appears to have been significant, especially when combined with the civil bench trial and its result. But most all prospective jurors agreed they could set aside any opinion they had about the case, remain fair and impartial, and follow the law as instructed by the district court. Those who admitted they could not do this were excused by the district court prior to peremptory challenges being exercised.

*Challenges exercised by defendant in jury selection*

In his appellate brief, Hudgins gives no particular attention to this factor, stating only that he made several motions to strike prospective jurors "some of which were granted and some of which were not." This court's review of the record has been more detailed. Hudgins made 17 motions to strike for cause. Of those, 10 were sustained by the district court; but only one of Hudgins' successful motions to strike appears related to the prospective juror's exposure to pretrial publicity. Hudgins' other successful motions to strike were based on other factors, such as prospective jurors' family associations, predisposed notions regarding alcohol use, or, in one instance, the prospective juror's profound hearing loss. In comparison, the State successfully challenged 8 prospective jurors for cause. One additional prospective juror was struck on a joint motion due to a felony conviction that rendered him statutorily ineligible to serve. See K.S.A. 2014 Supp. 43-158(c) (jury service exclusion for those with felony convictions within 10 years). Another was excused, on her own motion, to attend to a family medical emergency.

After accepting a pool of 42 panel members following voir dire, each party exercised 14 peremptory challenges. And as noted previously, no one who Hudgins sought to strike for cause during voir dire examination ended up serving on the final jury panel.

19

*Connection of government officials with publicity*

There is no evidence any government official was responsible for the publicity in the record, other than the comments by the civil trial judge that Hudgins was the only person at fault.

*Severity of the offense charged*

Clearly, the crimes charged were very serious and the circumstances tragic. Such an occurrence in a relatively small community would be expected to reach more deeply into the population.

*Size of the area from which prospective jurors are drawn*

Hudgins claims based on census information that Cherokee County had a population of persons 18 or older in 2012 of approximately 16,004, with a total population of 20,226.

In the ultimate balancing of these factors, difficulty in impaneling a competent and unbiased jury has been a key consideration. See *Roeder*, 300 Kan. at 914 ("Perhaps most importantly . . . 'there was no undue difficult[y] in [i]mpaneling a jury.'") (quoting *Higgenbotham*, 271 Kan. at 594); *State v. Verge*, 272 Kan. 501, 505, 34 P.3d 449 (2001) (impartial jury impaneled after lawful, proper jury selection process, despite survey indicating 96 percent of venue county residents had heard about case and 64 percent believed defendant guilty); *Higgenbotham*, 271 Kan. at 595 (no abuse of discretion given lack of evidence of problems selecting jury, despite extensive pretrial publicity and survey demonstrating more than half of venue county population believed defendant was

or probably was guilty); see also *State v. Jackson*, 262 Kan. 119, 131-32, 936 P.2d 761 (1997) (few problems impaneling impartial jury even though 36 percent of total panel excused for cause because all jurors were "rigorously questioned" and indicated they could listen to the evidence and reach verdict impartially).

In Hudgins' case, a few factors weigh in favor of a change in venue, but the balance does not. Importantly, the record does not demonstrate difficulty impaneling a competent and unbiased jury. As discussed, only 62 of the more than 120 prospective jurors summoned needed to be examined to pass the required 42 prospective jurors for cause. And all of the impaneled jury members indicated they could remain impartial and fair while following the law. Indeed, Hudgins directs us to no individual jurors who he claims should not have been seated on the final jury. Compare *State v. Carr*, 300 Kan. 1, 104-24, 331 P.3d 544 (2014) (analyzing specific juror challenges).

Because jury selection was not unduly difficult, we hold Hudgins fails to demonstrate actual prejudice from pretrial publicity. We cannot conclude that community prejudice from the publicity was a demonstrable reality such that it was reasonably certain Hudgins could not obtain a fair trial in Cherokee County. The district court did not abuse its discretion in denying the change of venue motions.

PROSECUTOR'S EXPLANATION OF LESSER INCLUDED OFFENSES

Hudgins argues next that the prosecutor committed reversible misconduct when discussing lesser included offenses of the felony-murder charges. This issue arises because the district court instructed the jury on five lesser included offenses of each felony-murder charge. In doing so, the court gave the standard PIK instructions as to how the jury is to consider lesser included offenses:  (1) "When there is a reasonable doubt as to which of two or more offenses defendant is guilty, he may be convicted of a lesser

21

offense only"; and (2) before stating the elements of each lesser offense: "If you do not agree that the defendant is guilty of the [immediately more serious offense], you should then consider the lesser included offense of . . . ."

But during closing arguments, the prosecutor attempted to explain what the instructions meant, saying:

"[F]irst, you look at first degree murder. *And only if he's not guilty of first degree murder do you go on*. If he's guilty of first degree murder, you don't consider the lessers. Because the Judge tells you if you do not agree that he's guilty of first degree murder, then you consider the lessers. Read that backwards. *What it means is you only consider the lessers if he is not guilty*." (Emphasis added.)

Similarly, in rebuttal the prosecutor told the jury:

"[Y]ou start at the top with felony murder. And you have to agree to go to the lessers . . . ."

". . . *You have to agree he is not guilty of felony murder. . . .* Sure, the other crimes fit because they're lesser includeds [*sic*]. . . .

"But the most severe crime that he's guilty of is felony murder. *And you only look at the lessers if he's not guilty of that*. Once you find him guilty of that, you stop, the test is over, and you're done." (Emphasis added.)

*Standard of Review*

Appellate review of a prosecutorial misconduct claim based on improper comments requires a two-step analysis. First, an appellate court decides whether the comments at issue were outside the wide latitude a prosecutor is allowed, *e.g.*, when

22

discussing evidence. If so, there was misconduct. Second, if misconduct is found, an appellate court determines whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013).

Appellate courts consider three factors in analyzing the second step: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the jurors' minds. But none of these factors individually controls; and before the third factor can override the first two, an appellate court must be able to say the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), have been met. *State v. McCullough*, 293 Kan. 970, 990-91, 270 P.3d 1142 (2012).

When both constitutional and nonconstitutional errors clearly arise from the same acts and omissions, an appellate court begins with a harmlessness analysis of the constitutional error. If the constitutional error is reversible, an appellate court need not analyze whether the lower standard for harmlessness under K.S.A. 60-261 also has been met. *Bridges*, 297 Kan. 989, Syl. ¶ 16. Under both standards, the party benefiting from the error bears the burden to demonstrate harmlessness. *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013).

*Discussion*

A misstatement of the law during a prosecutor's closing argument can deny a defendant a fair trial when "'the facts are such that the jury could have been confused or misled by the statement." *State v. Williams*, 299 Kan. 509, 544, 324 P.3d 1078 (2014) (quoting *State v. Phillips*, 295 Kan. 929, Syl. ¶ 5, 287 P.3d 245 [2012]).

23

Hudgins argues that because the jury was instructed its verdicts must be unanimous, the prosecutor's statements that lesser included offenses could be considered only if the jury found him "not guilty" of felony murder effectively meant the jury must unanimously agree he was not guilty before considering the lesser included offense. We recently considered a similar problem involving the same prosecutor and agreed it is improper to instruct or tell a jury that it must unanimously agree to acquit the defendant of the charged offense before it can consider lesser included offenses. See *State v. Parker*, No. 111,044, 2015 WL 968403, at *6 (Kan. March 6, 2015).

*State v. Hurt*, 278 Kan. 676, 101 P.3d 1249 (2004), is almost exactly on point and is cited by Hudgins in arguing for reversal of this conviction. In *Hurt*, defendant was charged with first-degree murder and the jury was instructed on that offense, as well as lesser included offenses of intentional second-degree murder and voluntary manslaughter. In closing arguments, the prosecutor said:

> "'If you're not convinced—first of all, if you are convinced that he's guilty of first-degree premeditated murder, check the guilty box, and you're done with that count. 'Cause, if you're convinced that he's guilty of that highest count, you need not go down any further to consider second-degree or voluntary.

> "'It's only if you're not convinced, all 12 of ya, that he's guilty of premeditated, and then you move your way down and ask yourself, Well, certainly, he intended to but maybe it wasn't premeditated. Again, read that definition of premeditation to yourselves and ask yourself, how can there [have] been any dispute that this was premeditated.

> "'Finally, if you're not convinced that this was a premeditated or even an intentional second-degree murder, then you're required to consider voluntary manslaughter.'" 278 Kan. at 681-82.

24

Hurt argued the statement that all 12 jurors must be unconvinced of guilt on the more serious crime before the jury considered the lesser included offenses improperly required the jury to unanimously acquit him of first-degree murder before considering lesser included offenses. The court held "it would be improper to state that all 12 jurors had to agree that there was a reasonable doubt before the jury could consider a lesser included offense." 278 Kan. at 682. But it was not convinced that was the meaning conveyed by the statement, so the court accepted in light of the ambiguity the proposition that the remarks were improper and turned to whether the error was reversible. It concluded it was not. See 278 Kan. at 682-85.

There are three potential scenarios when a jury begins deliberation on the highest offense. First, the jury can unanimously agree the defendant is guilty. Second, the jury can disagree with one another with some jurors believing the defendant is guilty and others not. Third, the jury can unanimously agree the defendant is not guilty of the primary offense. The concern here is that the prosecutor's statement, "You only go start working your way down the lesser included crimes if you find the defendant not guilty of capital murder," informs the jury it cannot consider the lesser included offenses if the jurors disagree with one another, *i.e.*, there is not unanimity.

As in *Hurt*, the prosecutor's statement in Hudgins' case is at best ambiguous taken in context because the term "not guilty" could mean the jury had to unanimously agree the State had not proven him guilty before considering the lesser included offenses. In other words, a jury of mixed conclusions would simply deadlock without trying to reach agreement on a lesser included offense. Resolving this in Hudgins' favor, as in *Hurt* and *Parker*, we hold it was error for the prosecutor to make these statements. Therefore, we move to the second prong of the analysis.

25

Hudgins seizes on the analysis in *Hurt* to argue that the prosecutor's comment "misstated clear and long-standing law regarding the jury's function" and therefore was gross and flagrant. Presumably, although not mentioned, Hudgins implies the same demonstrates the prosecutor's ill will. This misstep, he argues, compels reversal because Hudgins' defense was directed exclusively at convincing the jury to convict him of a lesser included offense rather than first-degree felony murder.

But we fail to see how the statement at issue can reasonably be seen as gross and flagrant, although the precedent from *Hurt* would put the prosecutor on notice of the potential for ambiguity. The prosecutor's statement was ambiguous with only one interpretation being that the prosecutor improperly told the jury it could only consider lesser included offense instructions if it unanimously found the defendant was not guilty of capital murder. In addition, the jury was instructed on the method of considering lesser included offenses from our standard PIK instructions, including resolving reasonable doubts in favor of convicting of the lesser offense—just like the jury in *Hurt*. From this, we are unable to conclude the jury would have latched onto the prosecutor's interpretation and ignored contrary written jury instructions.

Moreover, the evidence of Hudgins' guilt was so direct and overwhelming that, had the jury in fact adopted the prosecutor's incorrect interpretation, the error would have little weight in the jurors' minds. See *Parker*, 2015 WL 968403, at *7.  The eyewitness testimony of the deputy and motorists at the scene confirmed Hudgins was fleeing from the deputy both immediately before and at the time of the collision—injuries from which irrefutably killed the victims. There is nothing in the record to suggest otherwise, which leaves us with no reasonable possibility the prosecutor's comments affected the jury's verdict.

We hold the prosecutor's misstatement as to the process for considering lesser included offenses did not so prejudice the jury as to deny Hudgins a fair trial.

EVIDENCE REGARDING HIGH-SPEED PURSUIT POLICY

Hudgins argues next that the district court improperly excluded evidence that the deputy who pursued him violated departmental policy in doing so. Hudgins contends this evidence was relevant to causation in the felony murder context and that refusing to permit him to introduce it infringed on his constitutional right to present a defense. Because we agree with the State that Hudgins did not make an adequate proffer of the excluded evidence, we hold this issue is not preserved for appellate review and do not reach its merits. Again, some additional background is necessary.

In his opening statement, defense counsel told the jury there were policies about how police conduct high-speed chases and who can conduct them, which policies could be considered as contributing factors in connection with the crimes charged. During a break in the trial, the State moved to exclude any evidence of departmental pursuit policies on relevance grounds. Hudgins argued the evidence was "highly relevant to the situation" because the deputy pursued Hudgins for 11 miles allegedly in violation of departmental policy. The district court ruled the evidence was not relevant because the deputy was pursuing Hudgins, regardless of whether he acted within the policy when doing so.

Cocounsel then prompted the lead defense lawyer to make a proffer, to which, counsel responded, "Yes, naturally, I would proffer that the Court accept the policy in the record for review for purposes of appeal. And I object. I just formally object for the record."

But the trial transcript does not reflect that a written department policy was actually marked as an exhibit or provided to the district court informally. The record on appeal does not include the departmental policy; the deputy's testimony in the civil trial, to which defense counsel referred at one point in the discussion with the district court; or the deputy's personnel file, which trial counsel alluded to as being available for introduction into evidence.

In his appellate brief, Hudgins refers to the deputy "not acting within the sheriff department's own policies on high speed pursuit," but the only record citations are to the statements of defense counsel referred to above. And at oral argument, Hudgins' counsel conceded that neither the policy nor any other written document was in the record to articulate how the deputy supposedly violated departmental policy. In other words, except for counsel's conclusory statements, there is nothing for this court to review to determine the claimed relevancy of this excluded evidence.

K.S.A. 60-405 governs the adequacy of a proffer and provides:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of erroneous exclusion of evidence *unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers.*" (Emphasis added.)

The party being limited by the exclusion of evidence has the responsibility of proffering sufficient evidence to the trial court in order to preserve the issue on appeal. Failure to make a proffer of excluded evidence precludes appellate review because there is no basis to consider whether the trial court abused its discretion. *State v. Evans*, 275 Kan. 95, 99-00, 62 P.3d 220 (2003).

We hold the proffer and the record on appeal in this case do not satisfy the defendant's responsibility to provide an adequate record permitting our review of this issue. From the record created by Hudgins, we are not aware what, if any, departmental policy might be in dispute or how that policy may have been violated. As a result, we lack sufficient information to determine whether evidence of the unspecified violation might have been relevant. See *State v. Boleyn*, 297 Kan. 610, 622, 303 P.3d 680 (2013) (defining relevance and setting out standard of review for district court's relevance determinations).

## FAILING TO CHARGE DUI MANSLAUGHTER

Next, Hudgins argues the district court erred in binding him over for trial for felony murder with the underlying felony of fleeing and eluding a law enforcement officer. He argues he should have been charged with involuntary manslaughter while driving under the influence, K.S.A. 21-3442, because it was the more specific offense. He relies on *State v. Williams*, 250 Kan. 730, 736, 829 P.2d 892 (1992).

In *Williams*, the defendant was charged with indecent liberties arising from conduct with his step-granddaughter. The defendant moved to dismiss, arguing he should have been charged with aggravated incest, which he claimed was the more specific criminal offense, rather than indecent liberties. After the district court dismissed the indecent liberties charge this court affirmed, reasoning:  "For the general statute versus specific statute rationale to be applicable to the two crimes, the indecent liberties statute must be viewed as a statute generally prohibiting certain sexual behavior and the aggravated incest statute as applying to the identical prohibited conduct by a person related to the victim." 250 Kan. at 736. The court noted these particular statutes evinced the legislature's clear intent to establish certain sex offenses were applicable when family relationships were not involved, while a different crime (aggravated incest) applied when

29

committed by a person related to the victim, which under the statutes constituted a less serious offense. 250 Kan. at 736.

The State relies on *State v. Helms*, 242 Kan. 511, 748 P.2d 425 (1988), in which the court rejected an argument that the State lacked discretion to charge rape, rather than the allegedly more specific crime of indecent liberties. The *Helms* court agreed indecent liberties required proof of an element not required to prove rape but reasoned that rape also required proof of elements not present within the crime of indecent liberties. It added: "Although both crimes may be coincidentally present in the same set of factual events, the two crimes are directed at different actions." 242 Kan. at 426. The court noted the defendant's interpretation would result in perpetrators who rape children under 16 to be punished less severely than those who rape adults, which it concluded would "require an assumption that the legislature intended to afford less protection to the most vulnerable segment of our society." 242 Kan. at 427.

Under the rationales of both *Williams* and *Helms*, involuntary manslaughter while driving under the influence, K.S.A. 21-3442, is not a more specific crime than felony murder, K.S.A. 21-3401(b), with the underlying felony of fleeing and eluding a law enforcement officer, K.S.A. 8-1568(b). The State was not required to charge Hudgins with DUI manslaughter. In this instance, each crime requires proof of conduct the other does not.

At a minimum, DUI manslaughter requires proof the defendant was operating a vehicle under the influence of alcohol—while the felony-murder, fleeing and eluding, obviously does not. Similarly, the felony-murder, fleeing and eluding, crime requires proof a defendant was fleeing from a law enforcement officer at the time of the killing, while DUI manslaughter does not. In short, DUI manslaughter does not criminalize

identical conduct as felony murder, fleeing and eluding, as committed by a specific class of offenders, *i.e.*, those who were intoxicated at the time of the offense.

Accordingly, we hold that the legislature did not intend DUI manslaughter to be the exclusive statute under which Hudgins' conduct could be punished.

CUMULATIVE ERROR

Because prosecutorial misconduct was the only error arising from the issues raised and it has been determined to be harmless, cumulative error analysis is inapplicable. See *State v. Todd*, 299 Kan. 263, 286, 323 P.3d 829 (2014).

Affirmed.