IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,962

STATE OF KANSAS,
*Appellee*,

v.

JEFFREY WADE CHAPMAN,
*Appellant.*

SYLLABUS BY THE COURT

1.

An appellate court reviews a trial court's decision on a motion to change venue under K.S.A. 22-2616(1) for an abuse of discretion.

2.

An abuse of discretion can occur in three ways—when the trial court makes an error of law; bases its decision on facts not supported by the evidence; or makes an arbitrary, fanciful, or unreasonable decision.

3.

Factors to be considered when determining whether a venue change is necessary under K.S.A. 22-2616(1) include: (a) the degree of publicity circulated throughout the community; (b) the degree the publicity circulated throughout areas to which venue could be changed; (c) the length of time from the dissemination of the publicity to the trial date; (d) the care exercised and ease encountered in jury selection; (e) the familiarity with the publicity and its resultant effects upon prospective jurors or trial jurors; (f) challenges exercised by the defendant in jury selection, both peremptory and for cause; (g) the connection of government officials with the release of the publicity; (h) the severity of

1

the offense charged; and (i) the particular size of the area from which the prospective jurors are drawn.

4.

Error in the admission of evidence that does not implicate a defendant's constitutional rights is harmless if there is no reasonable probability the error affected the trial's outcome in light of the entire record.

Appeal from Barton District Court; RON SVATY, judge. Opinion filed April 28, 2017. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.:  A jury convicted Jeffrey Chapman of first-degree murder. In this direct appeal from his conviction, he argues the trial court erred by denying repeated efforts to obtain a change of venue due to pretrial publicity and by permitting the State to cross-examine him about a text message he claims was hearsay and unduly prejudicial. Finding no reversible error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On November 12, 2011, hunters driving along a rural road in Barton County discovered Damon Galyardt's body lying in a ditch with a bullet wound to the chest. The

police investigation led to Chapman, who knew Galyardt through a mutual friend. Chapman did not deny killing Galyardt.

Chapman testified at trial that he went to Galyardt's residence the night before the body was discovered. Chapman claimed he shot Galyardt in self-defense when Galyardt threatened to kill him with a knife. Chapman testified he then ran from the house and fled in a waiting car being driven by a friend. He did not call the police or seek medical help for Galyardt, but he did ask someone to monitor a police/emergency scanner to find out if anyone had alerted the police.

After learning nothing about emergency services being dispatched, Chapman returned to Galyardt's house and found him dead. Chapman said he left again before returning in a borrowed car to retrieve the body and dump it in the country. Driving back, Chapman threw blood-stained items from the car. He told a friend he had hit a dog and asked her to help clean blood from the car's back seat, purportedly from the dog.

The State's evidence included testimony that Chapman had previously threatened to kill Galyardt several times in the presence of multiple people, had told Galyardt's girlfriend he was going to kill Galyardt and dump his body in the country, and had told Galyardt in a phone conversation that was overhead by another that he was going to kill him.

Unpersuaded by Chapman's self-defense theory, the jury convicted him of first-degree premeditated murder. The district court imposed a hard 25 life sentence. Our jurisdiction is proper. See K.S.A. 2016 Supp. 22-3601(b)(3) (life sentence imposed).

3

Chapman argues the district court erred denying his requests to change venue based on pretrial publicity about his background, a defense motion to remove or cover his provocative tattoo, and his family. Chapman contends this publicity created an atmosphere in Barton County that jeopardized his right to fair trial. We disagree.

*Additional Facts*

Chapman filed a pretrial motion for a change of venue relying solely on K.S.A. 22-2616(1), which provides an avenue for a change of venue if the district court is satisfied there exists "so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county." Chapman argued without a supporting affidavit that "almost, if not every, person interviewed by law enforcement . . . stated that they knew . . . Chapman and/or the Chapman family personally or by reputation in the community," and "[i]ndividuals informed law enforcement that Mr. Galyardt's death was all over Facebook . . . ."

Chapman included 11 news articles about the crime and one website post about his family's connection to crime within the community. Of those articles, one detailed preliminary hearing testimony, six briefly reported Chapman's arrest and a trial postponement, and four detailed the murder investigation but did not mention Chapman. At a hearing on the motion, Chapman presented no other evidence and the district court denied the venue change.

Also around this time, Chapman filed a motion to permit him to cover or have removed a prominent tattoo on his neck that read "REDRUM" ("murder" spelled backwards). This motion sparked additional publicity, which Chapman characterized as

4

an "out-of-control media storm" that "totally frustrated" the purpose of the motion. He noted the Daily Mail from the United Kingdom, the Huffington Post, and the New York Daily News had published articles about the tattoo. Chapman claimed more than 800 residents had made comments on the Internet about him or the murder charges. Once again, he did not support these claims with supporting affidavits.

Chapman requested a trial continuance as his "primary resolution" for the tattoo publicity and venue change as his "[n]umber two" choice. The court again denied a venue change. But it granted Chapman's request to continue the trial to allow Chapman time to obtain a public opinion survey if he wanted to pursue a later motion to change venue.

Jury selection began about nine months later. Prospective jurors completed a questionnaire about their knowledge of the case. The court divided potential jurors into morning and afternoon panels. From the morning panel, the court excused 26 for various reasons, leaving 33 for voir dire with 19 of those 33 questioned individually. From the afternoon panel, there were 29 left after the court excused 13, with 22 of those remaining 29 questioned individually. Although the record is not entirely clear, it appears 16 potential jurors from the morning panel were excused due to their opinions regarding Chapman, the tattoo, or his family. Similarly, it appears five were excused for those same reasons from the afternoon panel.

The court conducted individual voir dire of prospective jurors whose questionnaire answers had shown some knowledge but were vague. During this process, the court instructed potential jurors not to answer a question out loud with statements that would prejudice the other potential jurors and said some individuals could be questioned in a back room when necessary so others could not hear their answers. The court encouraged candor and provided an instruction to prevent prospective jurors from inadvertent

5

exposure to the publicity. Chapman challenged one of these individuals for cause, and the court granted it.

At the general voir dire of the remaining prospective jurors, Chapman passed the panel for cause without any challenges. Throughout the jury selection process, Chapman made only four for-cause challenges, all of which were granted—three for impartiality and one for a personal relationship with the victim's mother. Each side exercised 13 peremptory challenges and a jury of 12 with four alternates was selected.

The following day, Chapman made his third motion for venue change. He noted "[his] case has been covered on Nancy Grace, CNN, ABC, CBS, and NBC due to his tattoo removal request." To demonstrate the statewide pretrial publicity concerning his tattoo and crime, Chapman introduced 23 news reports with several copies of the Internet users' comments from those stories and a printout of Yahoo search results for the phrase "Jeff Chapman tattoo." Of the articles, two were already included with Chapman's first venue motion and at least three contained identical content but were published by different media outlets. Many of the Internet comments were duplicates.

Chapman asked for an evidentiary hearing, which the court conducted later that same day. Chapman elaborated about the media publicity at the hearing, but he did not provide additional evidence. The State argued there was an insufficient legal basis to order a venue change. In reply, Chapman simply answered, "I'm right. He's wrong." The court again ruled venue would remain in Barton County, explaining:

> "I'm going to deny the motion. . . . [W]e have quite a few people who don't know anything even despite the concerns we all had and probably, because as professionals, we, as judges and attorneys, we pay attention to the news. We have a lot of people who don't pay attention to anything. So we have quite a group of those, and then we have a pretty strong group already, because . . . we have gone through 23, and we have only

6

removed two for cause, and basically, the cause had to do with the publicity . . . [.] I don't think it meets the standards for change of venue."

*Standard of Review*

A district court's ruling on a venue challenge brought under K.S.A. 22-2616(1) is reviewed for an abuse of discretion. *State v. Longoria*, 301 Kan. 489, Syl. ¶ 11, 343 P.3d 1128 (2015). An abuse of discretion can occur in one of three ways—when the trial court makes an error of law; bases its decision on facts not supported by the evidence; or makes an arbitrary, fanciful, or unreasonable decision. 301 Kan. 489, Syl. ¶ 12.

*Discussion*

Under K.S.A. 22-2616(1),

"In any prosecution, the court upon motion of the defendant shall order that the case be transferred as to him to another county or district if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

The statute "gives Kansans a vehicle to obtain a change of venue to prevent a local community's hostility or preconceived opinion on a defendant's guilt from hijacking his or her criminal trial." *State v. Carr*, 300 Kan. 1, 56, 331 P.3d 544 (2014), *rev'd and remanded on other grounds* 577 U.S. __, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016). The "'burden is on the defendant to show prejudice exists in the community, not as a matter of speculation, but as a demonstrable reality.'" 300 Kan. at 80 (quoting *State v. Anthony*, 257 Kan. 1003, 1013, 898 P.2d 1109 [1995]).

7

For claims pursued under the statute, we evaluate whether the level of prejudice warrants a venue change by considering the following factors: (1) the degree of publicity circulated throughout the community; (2) the degree the publicity circulated throughout areas to which venue could be changed; (3) the length of time from the dissemination of the publicity to the trial date; (4) the care exercised and ease encountered in jury selection; (5) the familiarity with the publicity and its resultant effects upon prospective jurors or trial jurors; (6) challenges exercised by the defendant in jury selection, both peremptory and for cause; (7) the connection of government officials with the release of the publicity; (8) the severity of the offense charged; and (9) the particular size of the area from which the prospective jurors are drawn. 300 Kan. at 81; *State v. Higgenbotham*, 271 Kan. 582, 592, 23 P.3d 874 (2001). For clarity, we address each factor in turn.

*Degree of publicity throughout the community*

Chapman primarily relies on the publicity. He points out the tattoo issue drew significant attention nationwide from Nancy Grace, CNN, ABC, CBS, and NBC. He notes the subject even reached the United Kingdom. But Chapman did not supply a survey to show prejudice existed in Barton County in support of his venue arguments, even though the district court continued the trial date to permit one. *Cf. Longoria*, 301 Kan. at 505 (telephone survey's outcome revealing 97 percent were aware of murder offense and numerous news stories covering the case); *Carr*, 300 Kan. at 49 (venue study's results indicating 96 percent of respondents were aware of case); *State v. McBroom*, 299 Kan. 731, 746, 325 P.3d 1174 (2014) (expert testimony by university professor in the department of communication studies); *Higgenbotham*, 271 Kan. at 593 (same). He essentially relied on the news articles in the record.

*Degree of publicity in areas to which venue could be changed*

Chapman did not present evidence about the degree of publicity circulated through areas to which venue could be changed. Instead, he makes a conclusory argument that "the publicity was significant in Great Bend, Hutchinson, and Wichita, but not necessarily other areas of Kansas." The State concedes this factor "likely weighs in [Chapman]'s favor" and then backtracks by arguing the case "simply did not attract state-wide attention and there were certainly other counties to which venue could have been changed where the jury pool would have known virtually nothing about the case." We take this remark to be an agreement with Chapman that the areas the trial would likely be moved to would have had significant exposure to some publicity, but that other parts of the state would not.

*Time between the publicity and the trial date*

The case received significant news coverage at two times. The first was the months following Galyardt's killing, for which period the record contains four news reports as to the investigation and three about the arrest. The second followed Chapman's motion to remove or cover the tattoo, which was approximately nine months before trial. Much of the coverage complained about is from the latter. But given the smooth jury selection, a nine-month period weighs against transferring venue or, at best, is neutral.

*The care exercised and ease encountered in jury selection*

Chapman does not discuss this factor in his brief, and the State only summarily argues special care was taken in jury selection. But the record is more illustrative in outlining the district court's care during jury selection and the ease encountered in the process. The district court used questionnaires and individual voir dire to isolate

9

prospective jurors tainted by pretrial publicity. The questionnaire answers caused the district court to excuse about 21 individuals who expressed strong opinions about Chapman, his family, or his tattoo. Otherwise, the record does not reflect the pretrial publicity caused any difficulty winnowing the remaining pool down to the 12 jurors and four alternates ultimately selected.

*Familiarity with publicity and its resultant effects*

The record reflects many prospective jurors said media reports would not affect their ability to be fair and impartial and that they could arrive at a verdict based solely on the evidence presented at trial. No individual who was unable to do so served on the jury.

*Challenges exercised by defendant in jury selection*

Each of Chapman's four for-cause challenges was granted, so no one he sought to strike for cause served on the jury. This means Chapman did not have to use peremptory challenges to remove someone unsuccessfully challenged for cause. Ultimately, Chapman received a 12-member jury with four alternates—none of whom had expressed or appeared to have harbored prejudice against him.

*Connection of government officials with publicity*

There is no evidence any government official was responsible for the publicity in the record.

*Severity of the offense charged*

Chapman was charged with one of the most severe offenses—first-degree premeditated murder.

*Size of the area from which prospective jurors are drawn*

Barton County provided a relatively small pool from which to draw prospective jurors. See *Longoria*, 301 Kan. at 510.

Taking all factors into consideration, in the final analysis a few could weigh somewhat in favor of a change in venue, but the balance does not. To be sure, this was a serious crime, occurring in a relatively small community. *Cf. Longoria*, 301 Kan. at 510 ("[A] population of 20,546 eligible jurors provided a relatively small pool from which to draw the venire panel."). There was appreciable publicity within the local area as borne out by the jury questionnaire responses. And it appears unchallenged that publicity reached at least a few other places to which venue might have been transferred. But any effort to ascertain the true impact of the publicity in the trial venue or alternate locations is hampered by the lack of publicity survey evidence. See *Longoria*, 301 Kan. at 510 (holding a degree of media coverage outside the community could be considered neutral factor because while local news covered the case extensively, media outside the community also published articles about the crime, and defendant did not provide survey results of other venues so the trial court could not assess the impact of the media publicity in other districts); *Carr*, 300 Kan. at 82 (reasoning second factor favored changing venue because defendants submitted telephone survey's results indicating effects of publicity about the case were "considerably less pronounced" in a different county). The articles included in the record give only a limited perspective.

11

Nevertheless, media publicity without more does not establish prejudice. *Higgenbotham*, 271 Kan. at 593; *State v. Verge*, 272 Kan. 501, 508, 34 P.3d 449 (2001). As we have previously noted, "[i]n the ultimate balancing of these [nine] factors, [the] difficulty in impaneling a competent and unbiased jury has been a key consideration." *State v. Hudgins*, 301 Kan. 629, 644, 346 P.3d 1062 (2015). Approximately nine months passed between the final spurt of publicity in the case and jury selection. *Cf.* 301 Kan. at 643 (11 months after civil case publicity not decisive); *State v. Roeder*, 300 Kan. 901, 912, 336 P.3d 831 (2014) (majority of media coverage occurred months before trial not "particularly compelling for either side"). Several prospective jurors knew about the case, and many were excused based on their questionnaire responses. But the questionnaire and individual voir dire process itself reflects the care exercised in the selection process to avoid empaneling jurors tainted by the publicity. *Cf. Hudgins*, 301 Kan. at 643 (noting use of extensive questionnaire to assist with jury selection demonstrated exceptional care in process). Moreover, the record shows the jury was selected with relative ease, with Chapman passing the panel for cause with no challenges during general voir dire.

After considering all these factors together—particularly the ease of jury selection—we conclude other reasonable judges might have denied Chapman's motions to change venue under the statute. Accordingly, the district court did not abuse its discretion keeping venue in Barton County.

ADMISSION OF TEXT MESSAGE TESTIMONY

Chapman next argues the district court erred admitting the substance of a text message in which he purportedly asked a friend before Galyardt's murder if the friend wanted to go "shoot a dog" because the evidence was hearsay and its probative value was outweighed by its prejudicial effect. We conclude any error was harmless.

12

*Additional Facts*

On direct examination, Chapman testified about his activities the day of Galyardt's death. He said he had worked on a car earlier in the day and then picked up Jesse Julian from work and drove to Great Bend. Chapman asked Julian to take him to Galyardt's house so he could talk to Galyardt after speaking on the phone with Galyardt's girlfriend, Summer Hoss, who Chapman said was crying about a confrontation with Galyardt.

On cross-examination, the State inquired what conversation, if any, Chapman had with Julian regarding what their plans were for that day. Chapman said he did not remember. The State continued this line of inquiry and asked about a text message he received from Julian. Chapman objected on the grounds of hearsay and prejudice.

The State argued the text message was not hearsay because the State did not seek to establish the truth of any matter asserted in it. Alternatively, the State argued even if the text message was hearsay it should be admitted as a vicarious admission under K.S.A. 2016 Supp. 60-460(i)(2). The court agreed with the State. The State then asked Chapman: "[D]o you recall receiving a text message from Jesse Julian's phone stating 'want to shoot a dog'?" Chapman said he did not remember and that he did not respond to that text message. The State discontinued this inquiry.

Following oral argument in this appeal, the State submitted a motion to clarify the record alerting the court and counsel that the actual text message from Julian was admitted into evidence without objection prior to Chapman's questioning and was part of the record on appeal. This admission occurred during the State's case in chief when a Verizon Wireless employee authenticated several computer discs containing the text message content for Chapman's phone.

13

*Standard of Review*

On appeal, the court reviews a district court's decision on the admission of hearsay evidence and its determination whether the probative value of evidence outweighs the risk of undue prejudice for an abuse of discretion. *State v. Reed*, 302 Kan. 390, 401, 352 P.3d 1043 (2015) (hearsay evidence); *State v. Remmert*, 298 Kan. 621, 628, 316 P.3d 154 (2014) (balancing of probative value and potential for undue prejudice), *disapproved of on other grounds by State v. Jolly*, 301 Kan. 313, 342 P.3d 935 (2015). Error in the admission of evidence that does not implicate a defendant's constitutional rights is harmless if there is no reasonable probability the error affected the trial's outcome in light of the entire record. See *State v. Page*, 303 Kan. 548, 557-58, 363 P.3d 391 (2015) (applying constitutional harmless error standard after concluding district court erred admitting testimonial hearsay); *State v. Akins*, 298 Kan. 592, 599-600, 315 P.3d 868 (2014) (setting out harmless error standards applicable to constitutional and nonconstitutional errors); see also K.S.A. 2016 Supp. 60-261. The burden of demonstrating harmlessness is on the party benefiting from the error. *State v. Brown*, 300 Kan. 542, 560, 331 P.3d 781 (2014).

*Discussion*

Chapman argues the question about the text message implied the "dog" was Galyardt and that the State wanted to question him about it for the truth of the matter asserted within the message to establish Chapman's intent. Moreover, he argues, the text message's probative value was outweighed by the risk of undue prejudice. The State counters on several fronts. First, it argues the text message was not hearsay because the purpose of the inquiry was to prod Chapman into further explaining his plans and activities the day of the killing—not to establish anything asserted in the message was true. Moreover, the State argues, "[n]o fact was stated in the text that could be true or

14

untrue." Second, the State argues the text message satisfied the vicarious admission exception to the hearsay rule. And finally, it argues any error in the admission of the text message was harmless.

This issue is more easily disposed of by simply moving to harmlessness without deciding whether the court erred. We note the State asserted in its motion to clarify the record that its harmless error argument was bolstered by the fact the message was already in the record without objection by the time Chapman was asked about it. Chapman points out the State had not previously argued the text was in the record and that it supposed the jury could have located the text message on the disc even though the disc's contents were not discussed at trial. Nevertheless, the message's existence in the record at the time of the State's back-and-forth with Chapman is not material to our harmless error analysis.

Chapman conceded he killed Galyardt, so the only issue was whether the killing was self-defense or premeditated murder. The exchange between the prosecutor and Chapman was at worst vague about the text's existence, let alone its content, because Chapman denied any recollection of it. In short, the question-and-answer Chapman now challenges did nothing to augment the State's other evidence supporting premeditation.

That evidence included direct and circumstantial proof that Chapman made multiple threats to kill Galyardt—both to Galyardt and others. And one threat foreshadowed precisely what happened: killing Galyardt and dumping his body in the country. The evidence further showed Chapman had a gun when he went to talk to Galyardt, did not call emergency services after the shooting, and took measures to conceal his involvement.

Viewing the alleged error in light of the entire record, there was not a reasonable probability the prosecutor's question about the text message affected the trial's outcome.

15

Affirmed.

ROSEN, J., not participating.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 113,962 vice Justice Rosen under the authority vested in the Supreme Court by K.S.A. 20-2616.