IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,492

STATE OF KANSAS,
*Appellee*,

v.

EFRAIN GONZALEZ JR.,
*Appellant.*

SYLLABUS BY THE COURT

1.

To support a conviction for an attempted crime, the evidence must permit a rational fact-finder to find beyond a reasonable doubt the defendant intended to commit the particular crime alleged.

2.

To convict a defendant of a specific intent crime on an aiding and abetting theory, that defendant must have the same specific intent to commit the crime as the principal.

3.

Convictions for two offenses arising from the same conduct do not violate double jeopardy if each offense requires an element not required by the other.

4.

Failure to make a sufficient proffer of excluded evidence precludes appellate review because there is no basis for the appellate court to consider whether the trial court

abused its discretion.

5.

A three-step process is used under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), to consider racial discrimination claims over the exercise of peremptory challenges during jury selection. First, the party contesting the strike must make a prima facie showing the other party exercised a peremptory challenge based on race. Second, if the requisite showing is made, the burden shifts to the party exercising the strike to articulate a race-neutral explanation for striking the prospective juror in question. In this second step, the striking party is required only to put forth a facially valid reason for exercising the strike, which does not need to be persuasive or plausible. Third, the trial court must determine whether the objecting party has carried the burden of proving purposeful discrimination. The district court's ruling on a *Batson* challenge is reviewed for abuse of discretion.

Appeal from Wyandotte District Court; ROBERT W. FAIRCHILD, judge. Opinion filed March 27, 2020. Affirmed.

*Jonathan Laurans*, of Kansas City, Missouri, argued the cause and was on the brief for appellant.

*Daniel G. Obermeier*, assistant district attorney, argued the cause, and *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Efrain Gonzalez Jr. appeals from convictions of felony murder, attempted aggravated robbery, and conspiracy to commit aggravated robbery. They stem from an incident in which the passenger in a car Gonzalez was driving shot and killed a

2

man outside a bar in Kansas City. The central question on appeal is whether sufficient evidence to prove intent to commit a robbery exists to support the convictions.

What little is known from the trial evidence is that Gonzalez pulled his car up behind the bar after eluding a police traffic stop a few minutes earlier and that the victim was shot. Nothing showed what might have been said between the victim and the car's occupants, so the State tried to prove the attempted aggravated robbery by relying on Gonzalez' text messages shortly before the killing. Arguably, the text messages and circumstances were ambiguous about whether the pair intended to rob the victim, so more was required.

We hold the evidence sufficient under our standard of review. What tied the ambiguous evidence together was the investigators' explanations about the meaning typically associated with the language in the texts, as well as a detective's testimony that one of the pair discussed pinpointing someone for a robbery. Taken together, this provided the jury a sufficient basis to infer the pair's intention to rob the victim. As for the remaining issues, we hold they do not warrant reversal, so we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

At 12:29 a.m., on November 27, 2016, Officer Kenneth Garrett stopped a vehicle for suspicious behavior and a noise violation. He described the vehicle as a boxy, black, 4-door Chevy. As Garrett approached, the vehicle drove off. The officer reported this to dispatch and began a search.

Just blocks from the traffic stop, Louis Scherzer was at a bar with family and friends. The bar's surveillance footage shows him going out the back door at 12:36 a.m. Within the next three minutes, there were gunshots. Scherzer emerged mortally wounded

3

from the alleyway and collapsed against the bar's front door. He pulled out his own gun and shot back.

Scherzer still had his keys and wallet containing cash when he died within minutes from a single gunshot wound. The bullet entered the lower-right portion of his back and exited around the left collar bone. A witness said gunfire came from an older, boxy, black car that drove away. People outside the bar flagged down Officer Garrett, who was still in the area looking for the car he had tried to stop. Garrett saw the car drive past the front of the bar but could not locate the vehicle after that.

Later that same day, police discovered outside Gonzalez' house a car matching the description of the one involved in the traffic stop and shooting. A trail of blood led inside the house, where officers found more blood and a .45 caliber handgun. Police arrested Gonzalez at the University of Kansas Medical Center, where he went for treatment of a gunshot wound to his foot.

Forensic analysis showed the gun was fired twice at the crime scene. An investigating detective testified Filiberto Espinoza, the occupant in Gonzalez' car, fired the shot that killed Scherzer, and Gonzalez shot himself in the foot.

The State's evidence tending to explain why Espinoza shot Scherzer consisted of text messages between Gonzalez and others around the time of the crime. In texts with his girlfriend from Gonzalez' phone, she asked him to come home. He told her shortly before midnight, "I got some shut [*sic*] to hadle [*sic*], baby." At 12:10, he told her, "I'm teammate's grip," and when she asked, "huh?," he replied "tanna [*sic*] get this paper, babe."

4

At 12:31 a.m., about the time of the traffic stop, Gonzalez messaged "high speed" to a friend. At 12:42 a.m., after Scherzer was shot, the friend replied "were you in one RN?" Gonzalez explained "yeah, they dumped at me." When asked why, he responded "Beto dumped at them." "Beto" is Espinoza's nickname. Gonzalez told his friend to "look SC," seemingly referring to a Snapchat video he took of himself leaving the traffic stop. When the friend asked whether "they shot at you" while he was "driving off," Gonzalez said "nah, smoked dud [*sic*]."

Two police detectives, Danon Vaughn and Tiffany Burgtorf, testified without objection they had experience investigating robberies and had heard people refer to robbery as trying to get paper. When asked "[w]hat does it mean as a robbery investigator when someone says that?" Vaughn answered, "It means a person is gonna go out and find some money, take some money from someone." When asked on redirect-examination what evidence linked Gonzalez to Scherzer's death given that Espinoza fired the fatal gunshot, Vaughn said,

> "He refers to Mr. Espinoza as a teammate right before he says they're gonna get that paper, meaning they're going to rob someone, just multiple occasions that they are together during this entire thing. He also mentioned that they discussed the robbery. They were together during the robbery. They were together when Mr. Scherzer was—was shot during that attempted robbery."

On recross-examination, defense counsel continued probing the issue with the following exchange:

> "Q. Do you have any evidence that Mr. Gonzalez . . . said . . . Mr. Espinoza, shoot him?
>
> "A. No.

5

"Q. Do you have any evidence that Mr. Gonzalez said to Mr. Espinoza, I want his money?

"A. Yes.

"Q. And that evidence would be what?

"A. That evidence would be his admission. That evidence would be the fact that they discussed pointing out Mr. Scherzer, identifying, pointing—pinpointing a victim, targeting a victim for the robbery that they attempted to do when they murdered Mr. Scherzer."

At that point, the prosecutor interrupted for a bench conference, during which she argued defense counsel was "opening the door for the proffered statement." The only clue in the record about what she was referring to comes from the district court's response, "Yeah, because he's got a statement from the co-defendant that says he was—he was the one that—I mean, your client was the one that came up with the idea . . . of the robbery." The court told defense counsel he would let the State "bring it in if you go this way." The prosecutor added "we have evidence that his client said the robbery was his idea . . . and that's evidence in this case. . . . He's opened the door for his statement, too."

When the recross-examination resumed, defense counsel changed course, asking only two more questions about the timing of Gonzalez' text messages. No statements like the ones described at the bench conference were admitted at trial.

After the State rested, Gonzalez put on testimony from his mother, seeking to establish he had consumed marijuana and a Xanax that might have impaired him at the time of the crimes. Gonzalez also sought to prove his intoxication through testimony

6

from Espinoza, but this was prevented when Espinoza invoked his Fifth Amendment privilege against self-incrimination.

In closing arguments, the State focused on the homicide. It argued the jury should convict Gonzalez of premeditated murder because the evidence showed Scherzer was "shot dead in the back without a chance to defend himself," which would not have happened if it was just a robbery gone wrong. It also asserted if the jury did not convict on that offense, it should still find him guilty of felony murder, for which it argued the jury needed only to find he was "actively participating with the goal to achieve an aggravated robbery." And in alleging Gonzalez and Espinoza were engaged in a robbery when the shooting occurred, the prosecutor pointed to Gonzalez referring to Espinoza as his "teammate," arguing this established a common goal. She also contended Gonzalez' phrase "trying to get the paper means money, robbery at that time of day."

Defense counsel claimed there was no robbery and that the "sheer reading" of the text messages was that "somebody named Tanna is gonna get some paper." He questioned the detectives' testimony that this meant the pair intended to rob someone, asking "[w]here's the evidence of that?" He asserted the facts did not show there was a robbery attempt because the victim was shot in the back. He also argued the pair did not intend to kill because only one shot was fired at Scherzer.

The jury convicted Gonzalez of first-degree felony murder, attempted aggravated robbery, and conspiracy to commit aggravated robbery. The district court imposed a hard 25 life sentence for the felony-murder conviction and two consecutive 32-month prison terms for the conspiracy and attempted aggravated robbery convictions.

Gonzalez timely appealed directly to this court, raising seven issues we have consolidated into six and reordered:  (1) whether sufficient evidence supports the

7

convictions; (2) whether the attempt and conspiracy convictions were multiplicitous; (3) whether the district court's aiding and abetting jury instruction constituted clear error; (4) whether the district court erroneously permitted Espinoza to invoke his Fifth Amendment privilege against self-incrimination because he had already pleaded guilty and been sentenced for his participation in the crimes; (5) whether the State's peremptory strikes during jury selection constituted purposeful racial discrimination to exclude prospective Hispanic jurors; and (6) whether cumulative error requires reversal.

Jurisdiction is proper. K.S.A. 2018 Supp. 22-3601(b)(3), (4).

SUFFICIENCY OF THE EVIDENCE

To support a conviction for an attempted crime, the evidence must permit a rational fact-finder to find beyond a reasonable doubt the defendant intended to commit the particular crime alleged. See *State v. Harris*, 310 Kan. 1026, 1030, 453 P.3d 1172 (2019); *State v. Louis*, 305 Kan. 453, 460, 384 P.3d 1 (2016). Gonzalez questions whether an adequate evidentiary basis existed for the jury to find beyond a reasonable doubt that he and Espinoza intended to rob Scherzer at the time of the shooting.

*Standard of review*

> "When a criminal defendant challenges the sufficiency of the evidence used to support a conviction, an appellate court looks at all the evidence 'in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' A reviewing court 'generally will "not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations."' [Citations omitted.]" *Harris*, 310 Kan. at 1030.

8

*Discussion*

We divide the sufficiency analysis into two parts. First, we consider the evidence supporting an intent to rob—an element necessary for both the felony-murder and attempted aggravated robbery convictions. Second, we examine the evidence supporting the conspiracy conviction. We hold the evidence sufficient to support all convictions.

*The evidence established the pair's intent to rob.*

Aggravated robbery is "knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person . . . committed by a person who . . . [i]s armed with a dangerous weapon; or . . . inflicts bodily harm upon any person in the course of such robbery." K.S.A. 2018 Supp. 21-5420. First-degree felony murder "is the killing of a human being committed . . . in the commission of, attempt to commit, or flight from an inherently dangerous felony." K.S.A. 2018 Supp. 21-5402(a)(2). Aggravated robbery is an inherently dangerous felony. K.S.A. 2018 Supp. 21-5402(c)(1)(D).

"An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 2018 Supp. 21-5301(a). An attempt requires three elements:  an overt act toward perpetrating the crime, intent to commit the crime, and failure to complete the crime. *State v. Netherland*, 305 Kan. 167, 177-78, 379 P.3d 1117 (2016). "To prove an attempt, the State 'must show . . . the actual intent to commit [the] particular crime.'" *Louis*, 305 Kan. at 460.

The State's case against Gonzalez proceeded on an aider and abettor theory. This means the State had to prove he or another, for whose conduct he was criminally

9

responsible, killed Scherzer and that the killing occurred while Gonzalez or another, for whose conduct he was criminally responsible, was trying to commit aggravated robbery. See *Netherland*, 305 Kan. at 178. The State did not have to prove Gonzalez "personally satisfied all of the elements of the underlying crime or that he fired the fatal shot." See *Netherland*, 305 Kan. at 178.

Gonzalez contends there was insufficient evidence a robbery was being attempted when the shooting occurred. He points out there is no video of a robbery; no eyewitness testimony that a robbery was underway; no proof of a struggle between himself or Espinoza and Scherzer; and no social media, text, or other forms of communication that "unambiguously on its face, evinced either a plan to commit a robbery before the shooting, or confirms a robbery was the incident taking place when Espinoza and Scherzer exchanged gunfire." He asserts the text messages in evidence—particularly "tanna get this paper"—are "too flimsy, broad and ambiguous to support a conviction" and that the detectives' interpretation represented mere speculation.

We observe there does not seem to be any dispute as to whether there was sufficient evidence of an overt act in furtherance of the crime—if Gonzalez and Espinoza intended to rob Scherzer. Certainly the cumulative evidence about what happened behind the bar is sufficient for that element. And the jury could easily have concluded from the evidence that a robbery was not completed. See *Netherland*, 305 Kan. at 178 (noting jury could infer failure to complete aggravated robbery from fact that homicide victim's wallet containing cash and a debit card remained in her pocket at the crime scene). So this leaves us with the question whether a rational fact-finder could have found beyond a reasonable doubt that Gonzalez intended to rob someone.

Intent is usually proven by inference arising from circumstantial evidence because direct evidence of a defendant's state of mind is rarely available. *State v. Thach*, 305 Kan.

10

72, 83, 378 P.3d 522 (2016). And when that is the case, the question becomes whether the circumstantial evidence is substantial or sufficient enough to sustain the conviction. We have held that circumstantial evidence "'need not rise to that degree of certainty which will exclude any and every other reasonable conclusion.'" *Thach*, 305 Kan. at 84 (quoting *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 551, 431 P.2d 518 [1967]). "But mere suspicion, however strong, is not enough and juries are not permitted to base verdicts of conviction on suspicion." *State v. Doyle*, 201 Kan. 469, 489, 441 P.2d 846 (1968).

An appellate court must determine whether the circumstances themselves are proved or inferred from other circumstances when a conviction is wholly based on circumstantial evidence. And a court must remain vigilant against inference stacking, which is impermissible because when the State asks a jury to make a presumption based on another presumption, the State fails to carry its burden to present sufficient evidence. *State v. Banks*, 306 Kan. 854, 859, 397 P.3d 1195 (2017).

In Gonzalez' case, proof of intent to commit robbery admittedly begins with some ambiguous circumstances. His text messages on their face convey no such intent, and Scherzer's property was not taken. Likewise, while the evidence shows Gonzalez was in the alleyway late at night, minutes earlier he had evaded a traffic stop several blocks away and Officer Garrett was in the area looking for him. But what gives all the evidence a concrete context is Detective Vaughn's testimony that either Gonzalez or Espinoza said they had discussed finding a victim that night for a robbery. This testimony was admitted without objection.

In the light most favorable to the State, we hold a rational fact-finder could have concluded beyond a reasonable doubt Gonzalez intended to rob Scherzer. See *Harris*, 310

11

Kan. at 1030. Taken as a whole, sufficient evidence existed to sustain both the felony-murder and attempted aggravated robbery convictions.

*The evidence established an agreement to commit aggravated robbery.*

Conspiracy is an agreement with another person to commit a crime or to assist in committing a crime. K.S.A. 2018 Supp. 21-5302(a). A formal agreement is not necessary. It is enough if the parties tacitly come to an understanding about the unlawful purpose, which can be inferred from sufficiently significant circumstances. *State v. Sharp*, 289 Kan. 72, 104, 210 P.3d 590 (2009). While the commission of a conspiracy requires such person or a coconspirator's overt act in furtherance of the conspiracy, Gonzalez does not dispute the evidence's sufficiency to prove an overt act. See K.S.A. 2018 Supp. 21-5302(a). For that reason, our issue is whether the evidence supplied a basis for a rational jury to find beyond a reasonable doubt that Gonzalez entered into an agreement with Espinoza to commit an aggravated robbery.

The investigators' explanations for the text messages exchanged before the shooting show Gonzalez and Espinoza operated as "teammates" in an enterprise to "get paper." And Detective Vaughn's testimony gave these messages more meaning by showing one of the pair admitted they discussed targeting a victim for a robbery. Taken together, we hold the evidence was sufficient for a rational fact-finder to conclude Gonzalez entered into an agreement with Espinoza to commit an aggravated robbery.

THE AIDING AND ABETTING JURY INSTRUCTION

The district court instructed the jury without a defense objection:

12

"A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime or advises another to commit the crime.

"The person is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime if the person could reasonably foresee the other crime as a probable consequence of committing or attempting to commit the intended crime.

"All participants in a crime are equally responsible without regard to the extent of their participation. However, mere association with another person who actually commits the crime or mere presence in the vicinity of the crime is insufficient to make a person criminally responsible for the crime."

The district court then instructed the jury on the elements of the substantive offenses: first-degree premeditated murder, its alternative charge of first-degree felony murder, the lesser included offense of second-degree intentional murder, attempted aggravated robbery, and conspiracy to commit aggravated robbery.

Gonzalez contends the aiding and abetting instruction improperly lowered the State's burden of proof on the specific intent crimes with which he was charged. He points specifically to the instruction's language that "[t]he person is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime if the person could reasonably foresee the other crime as a probable consequence of committing or attempting to commit the intended crime."

We agree giving the instruction was error but hold it was harmless under our clear error standard of review.

13

*Standard of review*

"When reviewing a jury instruction issue, an appellate court follows a well-known four-step analysis, whose progression and corresponding standards of review are: (1) the court considers the issue's reviewability from both jurisdiction and preservation viewpoints, employing an unlimited standard of review; (2) the court determines whether the instruction was legally appropriate, using an unlimited review; (3) it determines whether sufficient evidence existed, when viewed in the light most favorable to the requesting party, to support the instruction; and (4) if the court finds error, it then must decide whether the error was harmless, using the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011).

"The first step affects the last one because an unpreserved issue will be considered for clear error, i.e., the error may be considered harmless unless the party claiming it can convince the court the jury would have reached a different verdict without the error. K.S.A. 2018 Supp. 22-3414(3) ('No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous.'). [Citations omitted.]" *Harris*, 310 Kan. at 1034-35.

The first step in the progression can be quickly disposed of because Gonzalez did not object to the instruction at trial, so any error is reversible only if the instruction is clearly erroneous.

*Discussion*

To convict a defendant of a specific intent crime on an aiding and abetting theory, that defendant must have the same specific intent to commit the crime as the principal. *State v. Littlejohn*, 298 Kan. 632, 647, 316 P.3d 136 (2014).

"[A]n instruction must always fairly and accurately state the applicable law, and an instruction that does not do so would be legally infirm." *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). The instruction in Gonzalez' case accurately reflected Kansas' aiding and abetting statute. See *State v. Engelhardt*, 280 Kan. 113, 132, 119 P.3d 1148 (2005); K.S.A. 2018 Supp. 21-5210. But it did not accurately state the applicable law, based on our caselaw limiting the statute's use when defendants are charged with aiding and abetting specific intent crimes. See, e.g., *Engelhardt*, 280 Kan. at 132-33; *State v. Overstreet*, 288 Kan. 1, 10-13, 200 P.3d 427 (2009).

In *Engelhardt*, the victim died after he was stabbed multiple times in the head and chest. At trial, there was conflicting evidence about who killed the victim—the defendant or the accomplice. The defendant argued the instruction regarding reasonably foreseeable crimes committed in pursuit of the intended crime lowered the State's burden of proof on the premeditated first-degree murder charge and was confusing because he was also charged with several additional counts, including kidnapping, criminal threat, and battery. The defendant claimed the instruction did not specify which crime was the intended crime. The court held it was improper to give the instruction because it effectively operated as a felony-murder instruction, but the jury was not instructed on felony murder or the underlying felony, i.e., aggravated battery, that the State's appellate argument relied on. 280 Kan. at 133.

In agreeing with the defendant, the *Engelhardt* court explained: "if a felony-murder theory had been advanced by the State and instructed upon, it is well established that PIK Crim. 3d 54.05 [the paragraph imposing liability for crimes intentionally aided] rather than PIK Crim. 3d 54.06 [the paragraph imposing liability for reasonably foreseeable crimes committed in carrying out the intended crime] would have been the appropriate aiding and abetting instruction." 280 Kan. at 133. For support, the court cited *State v. Gleason*, 277 Kan. 624, 637-38, 88 P.3d 218 (2004). There, the *Gleason* court

15

held there was no error in failing to give the reasonable foreseeability instruction since in a felony-murder case when "the underlying felony is one inherently dangerous to human life . . . the foreseeability requirement is established as a matter of law."

In *Overstreet*, the defendant drove a vehicle involved in a drive-by shooting and was charged with aggravated assault and attempted premeditated first-degree murder. The trial court gave the jury both aiding and abetting instructions—the one concerning crimes intended by the aider and abettor, and the one concerning reasonably foreseeable crimes other than the intended crime. The *Overstreet* court held this was error because, as in *Engelhardt*, the defendant was charged "with a specific-intent crime under an aiding and abetting theory." *Overstreet*, 288 Kan. at 11. The court reasoned the foreseeability instruction—indicating the jury did not need to find Overstreet possessed the specific intent of premeditation if it found premeditated murder was a reasonably foreseeable consequence of aggravated assault—"negated the State's burden to prove an essential element of the crime charged: premeditation." 288 Kan. at 11. Moreover, "the fact that it may be foreseeable that someone may die as a result of a particular course of action does not give rise to the conclusion that the cause of death was premeditated." 288 Kan. at 12.

In Gonzalez' case, other than felony murder and conspiracy, three of the crimes on which the jury was instructed required specific intent: premeditated first-degree murder, intentional second-degree murder, and attempted aggravated robbery. See *State v. Deal*, 293 Kan. 872, 883, 269 P.3d 1282 (2012) (intentional second-degree murder is a specific intent crime); *State v. Gutierrez*, 285 Kan. 332, 343, 172 P.3d 18 (2007) ("[A]n attempt requires specific intent."). But the conspiracy to commit aggravated robbery crime here needed only to be committed "knowingly." See *State v. Butler*, 307 Kan. 831, 852, 416 P.3d 116 (2018) (holding district court appropriately instructed jury it had to find defendant knowingly committed conspiracy to commit aggravated robbery). Based on this, the instructions as given did nothing to inform the jury which of the crimes

16

submitted to it for deliberation was an "intended" crime and which might have been the "other crime" committed while carrying out the intended crime.

Despite this, the State argues the instruction was not error because the reasonably foreseeable requirement applied only to the "unintended" crimes and not the "intended" crimes and the jury could have only associated the instruction to the felony murder. But this is an argument for harmlessness, not for the instruction's legal appropriateness. And even if the foreseeable instruction could be viewed as limited only to felony murder, it still misstated the law because elements of felony murder do not require a jury to find the killing was reasonably foreseeable. See *Gleason*, 277 Kan. at 638 ("[T]he foreseeability requirement is established as a matter of law . . . for a murder conviction based upon aiding and abetting an inherently dangerous felony . . . .").

We hold this instruction was error since it was not legally appropriate. That brings us to consider whether the error is clear error because there was no objection from Gonzalez to giving it. To declare clear error, a reviewing court must be firmly convinced the jury would have reached a different verdict without the error. See K.S.A. 2018 Supp. 22-3414(3); *Harris*, 310 Kan. at 1034.

Gonzalez argues the instructional error requires reversal of all his convictions because the prosecutor, he believes, based her entire theory of guilt on aiding and abetting. To support this claim, he points to the prosecutor's statements that Scherzer would not be dead were it not for Gonzalez' assistance providing Espinoza with a gun and transportation. He then notes the prosecutor referenced "the erroneous aiding and abetting foreseeability" instruction when discussing the felony-murder charge and arguing death was a "reasonably foreseeable" consequence of robbing someone with a handgun. This, he claims, was the prosecutor's "ace-in-the-hole" because it allowed the State to gloss

17

over what he believes was the scant evidence showing a robbery was planned or attempted.

We hold Gonzalez has not shown under the clear error standard that the jury's verdict would have been different without the error. The jury acquitted him of premeditated first-degree murder, eliminating the concerns in *Engelhardt* and *Overstreet*. And because the district court properly instructed the jury on felony murder, the problem in *Engelhardt* did not arise. But even if the jury interpreted the aiding and abetting instruction to add a requirement to felony murder that the death be reasonably foreseeable, it would not have increased the likelihood of a guilty verdict because foreseeability is established in felony murder as a matter of law when the underlying felony is inherently dangerous to human life. *Gleason*, 277 Kan. at 638.

The prosecutor did not argue Gonzalez could be guilty of attempted aggravated robbery or conspiracy to commit aggravated robbery only if those crimes were reasonably foreseeable offspring of some other crime he intended to commit with Espinoza. This distinguishes *Overstreet*. Additionally, the felony-murder jury instruction, the State's evidence, and the State's argument presented aggravated robbery as the "intended crime" and the killing as "any other crime" committed while carrying out the attempted aggravated robbery. And the conspiracy charge alleging Gonzalez and Espinoza agreed to commit an aggravated robbery reinforces the conclusion that the jury would have viewed aggravated robbery as the "intended crime."

For these reasons, we are not firmly convinced the jury's verdict would have been different had the "reasonably foreseeable" jury instruction not been given.

Gonzalez argues his attempted aggravated robbery and conspiracy to commit aggravated robbery convictions are multiplicitous. He raises this argument for the first time on appeal, which presents a preservation concern.

*Preservation*

Generally, the court does not address constitutional issues for the first time on appeal. *Thach*, 305 Kan. at 81. But it may do so if the party trying to raise a new issue shows a recognized exception:

> "'(1) [T]he newly asserted claim involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) the claim's consideration is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court's judgment may be upheld on appeal despite its reliance on the wrong ground or reason for its decision.'" *State v. Hirsh*, 310 Kan. 321, 338, 446 P.3d 472 (2019).

Gonzalez argues the court should consider this issue because the first two exceptions apply to his case. See *Thach*, 305 Kan. at 81 (party asserting new issue on appeal must explain why exception applies). The State does not object, although the State's failure to object does not control. See *State v. Patterson*, 311 Kan. __, 455 P.3d 792, 796 (2020).

This court has previously cited the second exception, i.e., the interests of justice and preventing denial of fundamental rights, as a reason to entertain multiplicity issues raised for the first time on appeal. See, e.g., *State v. Davis*, 306 Kan. 400, 419-20, 394 P.3d 817 (2017). In this instance, we will proceed to the merits.

*Standard of review*

"Multiplicity challenges raise questions of law subject to unlimited appellate review. In addition, the interpretation of statutes necessary to multiplicity analysis is subject to de novo appellate review. [Citations omitted.]" *Hirsh*, 310 Kan. at 338.

*Discussion*

Convictions for two offenses arising from the same conduct do not violate double jeopardy if each offense requires an element not required by the other. *State v. Schoonover*, 281 Kan. 453, 495, 133 P.3d 48 (2006). The Double Jeopardy Clause prevents a defendant from being punished more than once for the same crime. Multiplicity in a criminal pleading involves charging a single offense in several counts of a complaint or information. *State v. Mincey*, 265 Kan. 257, 261-62, 963 P.2d 403 (1998).

To establish two convictions are for the same offense, two things must be present: (1) the convictions arise from the same conduct, and (2) by a statutory definition there is only one offense. As to the first, if the conduct is discrete, the convictions do not arise from the same offense and there is no double jeopardy violation. But if two convictions arise from the same act or transaction, the conduct is unitary, and the second factor must be analyzed. *Hirsh*, 310 Kan. at 339.

As to that, the court first asks whether the convictions arise from a single statute or many statutes. From that point, the analysis splits again. If the convictions are for several violations of a single statute, a unit of prosecution test applies, meaning the court examines the relevant statute to determine what the Legislature intended as the allowable unit of prosecution. But if the convictions are for violating different statutes, the same-elements test is applied. *Hirsch*, 310 Kan. at 339; *Schoonover*, 281 Kan. at 497-98. That test "'emphasizes the elements of the two crimes'" and inquires "'whether each offense

contains an element not contained in the other; if not, they are the "same offence" and double jeopardy bars additional punishment and successive prosecution.'" *Schoonover*, 281 Kan. at 467 (quoting *United States v. Dixon*, 509 U.S. 688, 704, 113 S. Ct. 2849, 125 L. Ed. 2d 556 [1993]).

In this case, neither party addresses whether the challenged convictions are based on unitary conduct. Gonzalez offers nothing on this point, and the State simply argues the convictions are not multiplicitous even if the underlying conduct was the same.

The acts alleged by the State occurred on the same evening. And they were causally related to one another in that the conspiracy precipitated the attempt, and there was no apparent fresh impulse motivating the attempt, as distinguished from the agreement to commit the offense. See 281 Kan. at 497 ("[S]ome factors to be considered in determining if conduct is unitary, in other words if it is the 'same conduct,' include: [1] whether the acts occur at or near the same time; [2] whether the acts occur at the same location; [3] whether there is a causal relationship between the acts, in particular whether there was an intervening event; and [4] whether there is a fresh impulse motivating some of the conduct.").

Even so, the conspiracy and aiding and abetting statutes each require an element not required by the other, so there is no double jeopardy violation. K.S.A. 2018 Supp. 21-5302(a) provides:

> "A conspiracy is an agreement with another person to commit a crime or to assist in committing a crime. No person may be convicted of a conspiracy unless an overt act in furtherance of such conspiracy is alleged and proved to have been committed by such person or a co-conspirator."

21

And a conspiracy to commit aggravated robbery must be committed "knowingly," even though the statute identifies no particular mental state that must be proven. *Butler*, 307 Kan. at 852.

Under the aiding and abetting statute, "[a] person is criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting the crime." K.S.A. 2018 Supp. 21-5210(a). When the crime at issue is an attempt, the mental culpability required is intent to commit that crime. K.S.A. 2018 Supp. 21-5301. Accordingly, the conspiracy and the aiding and abetting attempted aggravated robbery convictions are not multiplicitous. Each requires proof of an element not required by the other. See *Mincey*, 265 Kan. at 266.

Gonzalez acknowledges *Mincey*, but contends his convictions are still multiplicitous because, in his view, they were based on the same overt act. He analogizes this to a situation in which a single agreement to commit many crimes is improperly charged as multiple conspiracies. See, e.g., *Mincey*, 265 Kan. at 268 (holding multiple punishments could not be imposed for multiple conspiracy convictions arising from a single agreement to commit multiple crimes). But this logic suffers from two deficiencies—it misapplies the same-elements test and misapprehends the multiplicity problem in the single-conspiracy, multiple-criminal-objectives cases.

The same-elements test "'is concerned solely with the statutory elements of the offenses'" and "'has nothing to do with the *evidence* presented at trial.'" *Schoonover*, 281 Kan. at 467. The multiplicity issue in the single conspiracy, multiple-criminal-objectives cases is a unit of prosecution problem—with the unit of prosecution under "a general conspiracy statute" being the agreement, so a single agreement is one conspiracy no

matter how many crimes the conspirators agreed to commit. See *Mincey*, 265 Kan. at 268 ("When separate conspiracies are alleged and both are founded on a general conspiracy statute, the relevant inquiry is whether there existed more than one *agreement* to perform an illegal act or acts.").

There is no unit of prosecution problem here because the convictions arise from different statutes. We hold Gonzalez' convictions for conspiracy to commit aggravated robbery and attempted aggravated robbery are not multiplicitous.

### THE FAILURE TO COMPEL ESPINOZA'S TESTIMONY

Gonzalez argues the district court erred when it refused to compel Espinoza's testimony. The court reasoned it would violate Espinoza's Fifth Amendment privilege against self-incrimination. The State contends this issue is not preserved because Gonzalez' trial counsel conceded the testimony was privileged and because he did not adequately proffer Espinoza's expected testimony. We agree Gonzalez made an inadequate proffer.

By way of background, when the district court considered Gonzalez' desire to call Espinoza as a witness, Espinoza's counsel asserted two grounds for invoking the Fifth Amendment. First, Espinoza was pursuing a sentencing appeal. And, second, the time to file a postsentencing plea withdrawal motion had not yet run. In response, Gonzalez' counsel told the court,

> "Your Honor, we're gonna be asking questions regarding what he observed that night as regard to this defendant, not what Mr. Espinoza did and that's the reason we don't believe that there is a Fifth Amendment right. What we're gonna be asking specifically is the actions of . . . this defendant."

23

Espinoza's counsel countered that he believed the defense wanted to inquire whether Gonzalez was using drugs or intoxicated the night of the crime. And he suggested even Espinoza's limited testimony about Gonzalez' state of mind or intoxication would fall within the scope of Espinoza's Fifth Amendment privilege. The State agreed, noting that if Espinoza testified about Gonzalez smoking marijuana or taking Xanax, the State would be able to ask Espinoza about Gonzalez driving the car that night, their discussions about robbing someone behind the bar, and the other circumstances related to the voluntary intoxication issue.

The court ruled Espinoza would not testify. It reasoned it would be "impossible . . . to limit [the testimony] in any meaningful way without prejudicing one side or the other." And it explained that although it was "not sure" the sentencing appeal "deal[ing] with just the departure issue . . . [was] enough" by itself, Espinoza still had time to move for a plea withdrawal and the appeal made "the risk . . . too high. I'm not willing to mess up two . . . trials." Nothing more was said or proffered about Espinoza's expected testimony.

We hold there is an insufficient record about what Espinoza would have testified about as required by statute. K.S.A. 60-405 provides,

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence *unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers*." (Emphasis added.)

This statute has dual purposes: (1) It assures the trial court is advised of the evidence at issue and the parties' arguments, and (2) it assures an adequate record for

appellate review. See *State v. Hudgins,* 301 Kan. 629, 651, 346 P.3d 1062 (2015). In Gonzalez' case, any proffer reflected in the record was informal at best as the parties argued the merits, although that is not necessarily fatal. In *State v. Evans*, 275 Kan. 95, 62 P.3d 220 (2003), we held an informal proffer sufficient when

"the record show[ed] that the State was well aware of the evidence in this case when it filed its motion in limine claiming that [defendant] would introduce testimony of witnesses who saw Reed holding the gun immediately after the shot was fired. [Defendant's] attorney further pointed out at the hearing that the defense had a witness who would also testify that Reed later admitted to killing Prince. The trial court was further made aware of the testimony of these witnesses through the State's argument in favor of its motion in limine and defense counsel's argument opposing the State's motion." 275 Kan. at 101.

In contrast, the *Hudgins* court held a defense counsel's informal proffer of a police department policy about high-speed car chases and counsel's assertion the officer violated that policy did not preserve a challenge to the evidence's exclusion on appeal. The court reasoned, "From the record created by Hudgins, we are not aware what, if any, departmental policy might be in dispute or how that policy may have been violated. As a result, we lack sufficient information to determine whether evidence of the unspecified violation might have been relevant." *Hudgins*, 301 Kan. at 651.

The proffer in Gonzalez' case is much more like *Hudgins* than *Evans*. The prospect of Espinoza's testimony arose during a bench conference. There was no written motion with details about the testimony. In fact, the nature of Espinoza's testimony came from the prosecutor, who suggested defense counsel was trying to get Espinoza on the stand to say "I saw him take a Xanax or I saw him smoke marijuana." Defense counsel added only "we're gonna be asking questions regarding what he observed that night [in] regard to this defendant."

It is not clear from this what Gonzalez anticipated Espinoza saying. But even if the proffer established Espinoza would say he saw Gonzalez smoke marijuana or take a Xanax, there is nothing else about any other potentially relevant details his testimony could provide such as how much, when, or what specifically he observed about Gonzalez' behavior near the time of the crime.

Failure to make a sufficient proffer of excluded evidence precludes appellate review because there is no basis for the appellate court to consider whether the trial court abused its discretion. *Hudgins*, 301 Kan. at 651. We hold this proffer to be inadequate.

THE *BATSON* CHALLENGE

Gonzalez argues the State exercised peremptory strikes to "systematically eliminate[ ] many Hispanic jury panel members," violating his constitutional rights under *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) (forbidding prosecutors from challenging potential jurors solely because of race or on the assumption jurors of the same race as defendant would not consider the State's case impartially). His brief focuses on Hispanic jurors 34, 39, and 44, whose strikes he challenged at trial. He also inexplicably adds on appeal the State's peremptory strike of juror 38, an Asian woman, whom he did not challenge at trial.

*Additional facts*

The State explained it struck prospective juror 34 because she was young, was a student, had no job, and had an arrest in 2017. It said it struck prospective juror 39 because she worked for a community mental health program and this might lead to a pro-defense bias. The State said it struck prospective juror 44, who identified herself as

26

Hispanic, white, and African-American, because she was single, young, did not have children or a spouse, and had her job for less than a year.

The prosecutor commented, "I prefer jurors who are married, who have a long time on the job, who have kids. Not because young people are bad. It's just because I prefer to choose people who are more invested in the community." She explained the State struck prospective jurors 2 and 3, both white women; 38, an Asian woman; and 56, an African-American man, based on youth, being single, having no kids, having no job or short employment, or some combination of these factors.

Gonzalez argued the prosecutor's desire to exclude young people from the jury was itself discriminatory. He claimed prospective juror 34, while a student, also had a job as an administrator, so the only explanation for the challenged strike was race. He argued prospective juror 39, the community mental health worker, might not favor him at trial but would have been "helpful because one of the issues that we're raising is not guilty by reason of mental defect or disease." And he pointed out she was middle aged and lived in the community for a long time. He claimed prospective juror 44, while young, was vested in the community because she lived there her whole life and was employed as a bank teller.

After hearing the parties' arguments, the court simply ruled the State presented sufficient nondiscriminatory reasons to survive a *Batson* challenge.

*Standard of review*

Generally, each party may use their allotted peremptory strikes to reject potential jurors without stating a reason. *State v. Gonzalez-Sandoval*, 309 Kan. 113, 114, 431 P.3d 850 (2018). But the State's privilege to exercise peremptory challenges is subject to the

Equal Protection Clause, which has been applied to forbid a prosecutor from challenging potential jurors solely on account of their race or on the assumption that jurors of the same race as the defendant would not be able to consider the State's case impartially. *Batson*, 476 U.S. at 89. Based on this principle, if a defendant lodges a *Batson* challenge, a three-step process ensues:

"Under the first step, the party challenging the strike must make a prima facie showing that the other party exercised a peremptory challenge on the basis of race.

"Second, if the prima facie case is established, the burden shifts to the party exercising the strike to articulate a race-neutral reason for striking the prospective juror. This is a low burden because the justification need not necessarily be plausible or persuasive, even though it must be facially valid. The reason offered will be considered race neutral unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion.

"In the third step, the district court determines whether the opponent has carried the burden of proving purposeful discrimination. This step hinges on credibility determinations because usually there is limited evidence on the issue, and the best evidence is often the demeanor of the party exercising the challenge. As such, it falls within the trial court's province to decide, and that decision is reviewed under an abuse of discretion standard. An appellate court gives 'significant deference' to the district court's rulings.

"A district court abuses its discretion when it makes a decision based on an error of law or fact; or when it makes a decision that is otherwise arbitrary, fanciful, or unreasonable. [Citations omitted.]" *State v. Williams*, 308 Kan. 1320, 1328-29, 429 P.3d 201 (2018).

*Discussion*

When, as here, the State offers race-neutral explanations for a challenged strike and the trial court rules on whether the State has intentionally discriminated, the first prong of the *Batson* analysis is moot. See *Gonzalez-Sandoval*, 309 Kan. at 122. And Gonzalez—rightly—does not dispute the State's reasons for the challenged strikes were race-neutral on their face. The State's burden to come forward with a race-neutral reason for a strike is "'relatively low . . . the justification must be facially valid, but it need not necessarily be plausible or persuasive.'" 309 Kan. at 123. When the explanation offered does not relate to a characteristic of a particular race, that explanation is race-neutral. 309 Kan. at 123.

The issue here turns on whether the district court abused its discretion by concluding the State in fact exercised the challenges for the reasons given, rather than offering them as a pretext for purposeful discrimination. At trial, Gonzalez bore the burden of showing pretext. This required the judge to assess the plausibility of the reasons given in light of all evidence with a bearing on them. *Williams*, 308 Kan. at 1329-30.

Gonzalez did not at the time point the trial court to any empaneled jurors to whom the State's race-neutral reasons for the peremptory strikes also applied, although he does now on appeal. Under these circumstances, "comparability forms a poor basis for attacking the trial court's decision" because "[i]t is not the trial court's duty *sua sponte* to compare the information elicited from the other panelists with the characteristics named as reasons for striking the panelists whose removal is being challenged." *State v. Campbell,* 268 Kan. 529, 535, 997 P.2d 726 (2000).

29

Nevertheless, the comparisons Gonzalez offers on appeal do not show the district court abused its discretion. As to prospective juror 34, who was a 26-year-old student stricken for not having a job and having a prior arrest, Gonzalez asserts the State's reason must have been pretext because seven people who served on the jury had less education. But this misses the point. The State's rationale for the strike was not lack of education but a perceived lack of investment in the community compared to older individuals with families and stable employment.

As to prospective juror 39, who was stricken for involvement in a community mental health program, Gonzalez identifies an empaneled juror's spouse who worked for a "community-based organization." But that does not explain how the State's concerns about a juror involved in a community mental health program should apply to any person who works for a "community-based organization," let alone a spouse.

As to prospective juror 44, stricken for youth, job history, and not having a spouse or children, Gonzalez notes one empaneled juror was only 18, did not have children, and had only had his current job for six months. But the State exercised half its peremptory strikes for reasons relating to indicia of community investment. And as previously mentioned, the State struck four other prospective jurors—jurors 2 and 3, both white women, juror 38, an Asian woman, and juror 56, an African-American man—based on youth, being single, having no children, no job or short employment, or some combination of these factors.

Finally, we note in his appellate briefing Gonzalez mentions other peremptory challenges by the State in making his *Batson* claims to this court. But those were not argued to the district court, so any issues concerning them are unpreserved. See *State v. McCullough*, 293 Kan. 970, 994, 270 P.3d 1142 (2012) (holding defendant who failed to

object when district court did not assess whether race-neutral reasons for strike were pretextual failed to preserve the issue for appellate review).

We hold the district court did not abuse its discretion by finding Gonzalez failed to show purposeful discrimination given the State's race-neutral reasons for its peremptory strikes.

CUMULATIVE ERROR

Based on our analysis, Gonzalez establishes only a single error: the legally inappropriate aiding and abetting jury instruction. "One error is insufficient to support reversal under the cumulative error doctrine." *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018).

Affirmed.

PATRICK D. MCANANY, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge McAnany was appointed to hear case No. 119,492 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.