NOT DESIGNATED FOR PUBLICATION

No. 122,021

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSEPH DOUGLAS SPACKMAN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; SARA WELCH, judge. Opinion filed October 22, 2021. Affirmed.

*James M. Latta*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., HILL and CLINE, JJ.

PER CURIAM:  A jury in Johnson County District Court found Defendant Joseph Douglas Spackman guilty of six felony sex crimes against the older daughter of his then-wife and one felony sex crime against the younger daughter. Spackman has challenged the district court proceedings and the resulting convictions on an array of grounds. We find no bases warranting relief and, therefore, affirm the convictions and resulting sentences.

FACTUAL AND PROCEDURAL HISTORY

Given the issues on appeal, we need not set out the details of the sexual abuse. Spackman does not dispute the sufficiency of the trial evidence—principally the testimony of the victims—to support the elements of the charged crimes. The jury believed the accounts of L.S., the older victim, and M.S., the younger victim, over Spackman's testimony denying any wrongdoing. We do, however, offer an overview of the development of the case against Spackman.

L.S., who was born in 2000, initially accused Spackman of touching her twice in inappropriately sexual ways in March 2012. L.S. reported the incidents, both of which happened around spring break, to school employees several days later. Although law enforcement officers and a caseworker from the Department for Children and Families investigated L.S.'s accusation, no action was taken against Spackman. At the time, E.S., the children's mother, suggested L.S. made up the claims and described her daughter as having been otherwise untruthful and a disciplinary problem. E.S. and Spackman had been dating for several years and were then recently married.

In February 2016, M.S., who was born in 2005, told L.S. that Spackman had touched her inappropriately. L.S. immediately had M.S. repeat what she had said in a video recording on a laptop. The girls, who were visibly upset, played the video for their mother. E.S. packed some clothing and other things; she and the children left the house and stayed with a friend. The friend recommended that E.S. take M.S. to the hospital. E.S. did so.

A specially trained nurse conducted a forensic sexual assault examination of M.S. And hospital personnel contacted the Overland Park Police Department. Officers with the department began an investigation. M.S. recounted how Spackman assaulted her. During the investigation, L.S. reported that Spackman had continued to sexually abuse her after

the 2012 incidents. The forensic examination of M.S. yielded DNA evidence consistent with Spackman, such that 1 in about 750 randomly selected Caucasian or Hispanic males would match the sample.

The State proceeded to trial against Spackman in January 2019 on one count of aggravated indecent liberties with a child involving M.S. and four counts of aggravated indecent liberties with a child, one count of statutory rape, and one count of criminal sodomy involving L.S. As we indicated, L.S. and M.S. testified during the trial, along with other prosecution witnesses including the nurse and the DNA analyst. Spackman testified in his own defense and denied having any inappropriate physical contact with either L.S. or M.S. He suggested L.S. disliked him and enlisted M.S. to falsely accuse him of sexually abusing her. He testified L.S. had admitted to him that she lied in 2012 when she accused him. Spackman also told the jurors his DNA could have been transferred to M.S. if they had inadvertently used the same bath towel.

The jury convicted Spackman as charged. At a later hearing, the district court sentenced Spackman to a term life in prison with parole eligibility after 25 years for each of the off-grid convictions to be served concurrently but consecutive to terms of years for the guidelines convictions. The composite sentence yielded a controlling term of incarceration of life plus 110 months with lifetime parole should Spackman be conditionally released from prison. Spackman has appealed.

LEGAL ANALYSIS

Spackman raises multiple issues on appeal: (1) The crimes of conviction unconstitutionally impose a form of strict liability; (2) L.S.'s testimony was so nonspecific the jurors could not have reached a constitutionally permissible unanimous verdict; (3) the Kansas rape shield law violates his due process rights; (4) the prosecutor made improper statements during jury selection and in closing argument depriving him of

a fair trial; and (5) the cumulative effect of the trial errors likewise precluded a fair trial. We take those points up in order, adding facts as necessary.

*Strict Liability*

Spackman contends the crime of rape, as codified in K.S.A. 2020 Supp. 21-5503, violates the Kansas Constitution Bill of Rights § 1 and § 5 because it imposes a form of strict liability if the victim is under 14 years of age. He then invites us to find the same constitutional defect undermines K.S.A. 2020 Supp. 21-5504, criminalizing sodomy, and K.S.A. 2020 Supp. 21-5506, criminalizing indecent liberties with a child, because those crimes also treat the victim's age as an element of some forms of the offenses. We find the arguments unpersuasive. Spackman did not raise these constitutional arguments in the district court, and the parties spar over whether we should consider them. We assume they have been properly preserved and presented.

Under K.S.A. 2020 Supp. 21-5503(a)(3), an individual commits rape by having sexual intercourse with a child under 14 years of age. The individual need not know the child's age, and the lack of knowledge is not a defense. See K.S.A. 2020 Supp. 21-5204(b). Spackman says that form of the crime, commonly known as statutory rape, imposes a species of strict liability that curtails or eliminates bad intent or a mens rea. For purposes of this appeal, we do not quibble with the characterization of statutory rape as a strict liability crime. See *State v. Dinkel*, 314 Kan. ___, 2021 WL 4343322, at *9 (No. 113,705, filed September 24, 2021) ("[T]here is no mental culpability requirement for rape of a child under 14."; cf. *State v. Thomas*, 313 Kan. 660, 662, 488 P.3d 517 (2021) (court assumes rape to be strict liability crime in rejecting defendant's due process claim K.S.A. 2020 Supp. 21-5204 impermissibly dispenses with requirement defendants know or have reason to know victims have not consented).

4

From that premise, Spackman submits statutory rape violates the right to jury trial preserved in § 5. Section 5 of the Kansas Constitution Bill of Rights states: "The right of trial by jury shall be inviolate." And the Kansas Supreme Court has construed the language as retaining "the jury trial right as it historically existed at common law when our state's Constitution came into existence." *State v. Albano*, 313 Kan. 638, Syl. ¶ 1, 487 P.3d 750 (2021). Spackman posits that strict liability crimes were unknown at common law. In other words, according to Spackman, common-law crimes invariably consisted of a requisite bad act (the actus reus) and a requisite bad intent (the mens rea). We aren't disposed to accept that premise. But even if it were true, it proves too little here.

First, as the court recognized in *Albano*, what's protected in § 5 is the division of decision-making between a jury and the district court. In a criminal case, the jury is constitutionally mandated to decide the facts bearing on guilt or innocence based on the trial evidence. The district court, then, determines matters of law and imposes an appropriate punishment upon a guilty verdict. 313 Kan. at 647-48, 652. A jury's fact finding necessarily corresponds to the elements of a given crime. What § 5 protects is the fact-finding function itself, not the crime-specific elements to be found. Spackman's proposition rests on a petrification of the substantive criminal law as it was in 1859 when the Kansas Constitution, including § 5, was ratified. Section 5 did no such thing, as the discussion in *Albano* confirms.

Moreover, Spackman's argument falters because Kansas had supplanted common-law crimes with a comprehensive criminal code before the Kansas Constitution was drafted and ratified. See Kan. Terr. L. 1859, ch. 28; Kan. Terr. L. 1855, ch. 48. The legislative enactment of a criminal code supersedes common-law crimes. See *State v. Sexton*, 232 Kan. 539, Syl. ¶ 1, 657 P.2d 43 (1983); *State v. Young*, 55 Kan. 349, 356, 40 P. 659 (1895). So the right to jury trial did not encompass common-law crimes at the time of ratification. Rather, defendants were entitled to have juries determine their guilt or innocence based on crimes legislatively codified in the territorial laws.

5

In 1859, the territorial criminal code included statutory rape, defined as "carnally and unlawfully knowing any female child under the age of ten years." Kan. Terr. L. 1859, ch. 28, § 26. When the framers drafted § 5, Kansas recognized statutory rape as curtailing the required mens rea based on the victim's young age in a way similar to Spackman's characterization of rape under K.S.A. 2020 Supp. 21-5503(a)(3) as a strict liability crime. See *In re Lloyd*, 51 Kan. 501, 502-03, 33 P. 307 (1893) (recognizing underage victim's consent did not furnish defense negating criminality of act of sexual intercourse under statute using same language as territorial proscription of statutory rape). In short, there was no extant common-law offense governing sexual intercourse with children below a specified age when the Kansas Constitution was drafted and ratified, so § 5 would not have preserved some right to jury trial for that crime to the exclusion of a prosecution for violating the statutory crime already enacted in the territorial laws. Kan. Const. Schedule § 4 (territorial laws to remain in effect upon congressional approval of Constitution until those laws otherwise repealed). In the same vein, nothing in Spackman's argument (or in § 5) would preclude the Kansas Legislature from amending the criminal code from time to time, and those amendments would not expand or contract the constitutional right protected in § 5.

Spackman similarly asserts statutory rape violates liberty interests protected in the Kansas Constitution Bill of Rights § 1 because the crime is not narrowly tailored to promote a compelling governmental interest. Cf. *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 671, 440 P.3d 461 (2019) (Section 1 protects fundamental right of personal autonomy subject to narrowly tailored limitations promoting compelling governmental interest). He contends a statute containing a knowledge or scienter requirement as to the victim's age would be just as effective in protecting children and promoting public policies grounded in the criminal law. And he says statutory rape is, therefore, not narrowly tailored. Spackman's premise of equivalent deterrence is specious, and he cites no legal or social science support for it.

Assuming § 1 even reaches this aspect of K.S.A. 2020 Supp. 21-5503(a)(3), we are unpersuaded the treatment of the child's age is constitutionally infirm, especially given the deep historical roots of statutory rape as a crime that does not require the perpetrator's knowledge of the victim's age. See *Thomas*, 313 Kan. at 664 (noting longstanding recognition of "constitutional validity" of statutory rape under Kansas law); see also 65 Am. Jur. 2d, Rape § 11 (public policy interests in criminalizing statutory rape); 6 Am. Jur. 2d, Proof of Facts § 63, Mistake as to Age of Statutory Rape Victim § 1 (historical basis for crime). Protecting children under 14 years of age from sexual exploitation at the hand of adults, even if they ostensibly consent, is a compelling governmental interest. For the most part, children of that age lack the maturity to make well-reasoned decisions about engaging in sexual relations and may be manipulated (often easily) by much older adults. Statutory rape laws, such as K.S.A. 2020 Supp. 21-5503(a)(3), place the risk of error on the adult and thus deter sexual conduct if there is doubt about the other participant's age. That's sufficiently focused to survive constitutional examination. And the deterrent effect undercuts Spackman's foundational premise. Narrow tailoring doesn't necessarily require the most exacting standard—here, requiring an adult to have actual knowledge of a sexual partner's age—to be constitutionally acceptable where the regulated conduct is itself socially undesirable and commands no constitutional protection. See *State v. Mossman*, 294 Kan. 901, 910-11, 281 P.3d 153 (2012) (recognizing typically exploitive nature of sexual relations between adult and underage teen).

As we indicated, Spackman invites us to adopt either or both of his arguments to invalidate those forms of criminal sodomy and indecent liberties with a child that include elements dependent upon the victim's age. For the same reasons we have found the arguments unavailing as to statutory rape, we decline Spackman's invitation to apply them elsewhere.

*Unanimous Verdict*

Spackman next argues he has a right to a unanimous jury verdict under the Sixth Amendment to the United States Constitution and that right was breached in L.S.'s testimony outlining the instances of sexual abuse because they were not described with sufficient particularity. We agree Spackman has identified a newly recognized constitutional right, but we don't share his application of it. Again, we bypass the parties' fencing over preservation of this issue for appellate review.

In *Ramos v. Louisiana*, 590 U.S. __, 140 S. Ct. 1390, 1396-97, 206 L. Ed. 2d 583 (2020), the United States Supreme Court held that the unanimous verdict requirement it had long recognized as a component of the Sixth Amendment right to jury trial in federal criminal cases should be incorporated through the Fourteenth Amendment and applied to state criminal prosecutions. Given the Kansas Supreme Court's approach to constitutional jurisprudence that typically recognizes rights under the Kansas Constitution equivalent to those the United States Supreme Court has found in comparable provisions of the United States Constitution, we presume there is a right to unanimous jury verdicts in criminal cases grounded in § 10 of the Kansas Constitution Bill of Rights and, perhaps, in § 5.

But we find Spackman's argument for a violation of his constitutional right to a unanimous jury verdict difficult to follow. He appears to suggest the jurors could not possibly have agreed he committed particular acts of sexual abuse because L.S. described the incidents only in general terms. And, as a result, he says that deprived him of unanimous verdicts—a defect he likens to a structural error requiring reversal without a showing of actual prejudice. At the same time, however, Spackman submits the issue differs from a multiple acts problem in which jurors have been presented with evidence supporting more instances of wrongful conduct than charged crimes. To protect a defendant's right to a unanimous verdict in that situation, the district court typically will instruct the jurors that they must agree on one specific act for each charge to return a

guilty verdict. See *State v. Cottrell*, 310 Kan. 150, 154-55, 445 P.3d 1132 (2019) (recognizing rule but finding no multiple acts); *State v. Colston*, 290 Kan. 952, 961, 235 P.3d 1234 (2010) (use of jury instruction); PIK Crim. 4th 68.100 (2020 Supp.) (instruction on multiple acts and need for unanimity as to particular act). Here, the district court included a unanimity instruction on all but one of the counts identifying L.S. as the victim, and Spackman has not challenged the one conviction for that reason.

We feel adrift in navigating Spackman's constitutional argument. The jurors had to resolve a credibility contest between L.S. and Spackman and did so in favor of L.S. If believed, L.S.'s testimony established physical acts on Spackman's part that entailed sexual contact proscribed under the applicable statutes. L.S. described where the acts took place and identified Spackman as her abuser. Although the abuse involved repeated instances of the same sort of conduct, that does not amount to a constitutional defect in the State's proof. Spackman has not satisfactorily explained why we should treat it that way. A putative victim's unusually generic testimony about the charged criminal conduct might open a line of attack on his or her credibility and a closing argument urging the jurors to find a reasonable doubt about what really happened. But that's far different from a constitutional defect requiring reversal of a conviction for lack of jury unanimity. Spackman hasn't crossed that threshold.

*Rape Shield Statute*

Spackman next argues that K.S.A. 2020 Supp. 21-5502, commonly known as the rape shield law, is unconstitutional and cannot be enforced. In turn, he submits the district court improperly relied on the statute in refusing to admit evidence he says bears on L.S.'s credibility. We find the argument strained and unpersuasive. This is another issue Spackman has raised for the first time on appeal. We indulge him and put aside the State's counter based on lack of preservation.

Spackman wanted to introduce evidence at trial that after the incidents at issue here, L.S. went on a sexually oriented website and lied about her age to access the content. He also wanted to introduce evidence that L.S. had made accusations of sexual abuse against other individuals. Under K.S.A. 2020 Supp. 21-5502(b), in a sex crimes prosecution, the defendant generally cannot introduce evidence of the victim's "previous sexual conduct." A defendant must file a pretrial motion with the district court to do so. After a hearing, the district court may allow such evidence if it is relevant and not otherwise inadmissible. K.S.A. 2020 Supp. 21-5502(b).

The district court denied Spackman's motion, finding the evidence was not sufficiently probative of L.S.'s credibility to be admitted as an exception to the general prohibition in K.S.A. 2020 Supp. 21-5502(b). Spackman has not asserted the district court incorrectly applied the rape shield statute or otherwise abused its discretion in denying the motion. Rather, he attacks the constitutionality of K.S.A. 2020 Supp. 21-5502 on the grounds it deprives criminal defendants of due process by creating an unlevel evidentiary playing field or lack of reciprocity with the State in pretrial practices. Spackman cites K.S.A. 2020 Supp. 60-455 as a counterpoint allowing the admission of a criminal defendant's other crimes or civil wrongs as trial evidence. He contends what he characterizes as the disparities between the exclusion of evidence pertaining to victims in sex crime cases under K.S.A. 2020 Supp. 21-5502 and the admission of evidence pertaining to criminal defendants under K.S.A. 2020 Supp. 60-455 create a due process violation, and he cites *Wardius v. Oregon*, 412 U.S. 470, 472, 93 S. Ct. 2208, 37 L. Ed. 2d 82 (1973), as his supporting authority.

But *Wardius* offers an inapt comparison. In *Wardius*, the Court held that an Oregon statute violated fundamental due process rights by requiring criminal defendants to identify before trial any witnesses supporting an alibi defense without imposing a reciprocal obligation on the State to disclose witnesses who would rebut the alibi. 412 U.S. at 472. The constitutional vice lay in "requir[ing] a defendant to divulge the details

10

of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State." 412 U.S. at 476. Although the *Wardius* Court suggested due process requires some "balance of forces between the accused and his accuser," it did not examine reciprocality apart from the disclosure of alibi witnesses. 412 U.S. at 474.

The Court recognized a due process need for mutual pretrial discovery of evidence bearing on a narrow issue: a defendant's claimed alibi. Spackman presents us with quite a different proposition. He says two statutes regulating the admissibility, not the discovery, of different types of evidence somehow offend the discrete due process protection for criminal defendants embodied in *Wardius*. And, in turn, the rape shield law must be declared unconstitutional. Spackman's logical and legal leap tumbles into the abyss. The juxtaposition of the rape shield protections in K.S.A. 2020 Supp. 21-5502 and the use of other crimes evidence in K.S.A. 2020 Supp. 60-455 does not create an imbalance upending constitutional due process.

As we have explained, K.S.A. 2020 Supp. 21-5502 imposes a general rule of inadmissibility in a sex crime prosecution of evidence about the victim's "sexual conduct"—an exceptionally encompassing category typically covering intimate lawful activity most people endeavor to keep private. But the statute permits a district court to make a case specific determination that such evidence might be of such relevance as to be admissible. The statute, then, does not impose a categorical exclusion of sexual conduct evidence.

Similarly, K.S.A. 2020 Supp. 60-455(a) generally treats a criminal defendant's commission of "a crime or civil wrong" apart from the charged crimes as inadmissible trial evidence. The statute contains two exceptions to the general rule of inadmissibility. Other crimes evidence may be admitted if those facts bear on some aspect of the charged crime. For example, the State may circumstantially prove identity by showing the

defendant previously committed similar crimes using a highly distinctive method common to the charged crime. The State, likewise, could show the defendant stole a car to use as a getaway vehicle in a charged jewelry store robbery, even though the defendant had not been charged with auto theft. See K.S.A. 2020 Supp. 60-455(b) (admissibility to prove "material fact" including identity, preparation, and plan); K.S.A. 2020 Supp. 60-455(c) (admissibility to prove "modus operandi" as establishing identity). More to the point here, perhaps, is the second exception: In prosecutions for designated sex crimes, the State may offer evidence the defendant committed other statutorily defined acts of "sexual misconduct" to prove propensity or for any other relevant purpose. K.S.A. 2020 Supp. 60-455(d).

The State must give the defendant notice at least 10 days before trial of any evidence to be offered under K.S.A. 2020 Supp. 60-455, affording the defendant the opportunity to file a motion in limine with the district court to preclude or limit the evidence. K.S.A. 2020 Supp. 60-455(e). In any event, the district court should exclude the evidence if its probative value is substantially outweighed by its undue prejudice to the defendant. *State v. Hachmeister*, 311 Kan. 504, 510-11, 464 P.3d 947 (2020).

We fail to see a degradation of Spackman's due process rights in the way he alleges. There is no discordance between K.S.A. 2020 Supp. 21-5502 and K.S.A. 2020 Supp. 60-455 implicating due process protections for criminal defendants comparable to the defect the *Wardius* Court found in Oregon's one-sided disclosure of alibi evidence. The rape shield statute contains a general rule of exclusion of certain lawful activity of victims of sex crimes. Conversely, K.S.A. 2020 Supp. 60-455(d) has a general rule of admissibility in sex crimes prosecutions of defendants' acts of sexual misconduct apart from the charged crimes. By statutory definition, those acts almost certainly will be illegal. K.S.A. 2020 Supp. 60-455(g) (defining acts of sexual misconduct). The two categories of evidence regulated by K.S.A. 2020 Supp. 21-5502(b) and K.S.A. 2020

12

Supp. 60-455(d) are materially different and certainly do not comprise reciprocal discovery and evidentiary treatment of a single factual circumstance like an alibi.

Moreover, each statute permits judicial intervention before trial to override the general rule to ensure a fair trial in any given case. So a defendant may be permitted to use evidence of a victim's sexual conduct upon a specific showing of relevance and need, notwithstanding the default against admissibility in K.S.A. 2020 Supp. 21-5502. Likewise, a defendant may successfully exclude other crimes evidence under K.S.A. 2020 Supp. 60-455 with a specific showing of irrelevance or undue prejudice. Those procedures for judicial notice and hearing avoid any gross imbalance between the State and the defense undermining due process protections comparable to the forced disclosure of a defendant's alibi evidence with no reciprocal disclosure of the State's countervailing evidence.

*Prosecutorial Error*

Spackman next contends the prosecutor made improper comments twice during jury selection and twice in closing argument. Spackman brands those remarks as prosecutorial error that deprived him of a fair trial.

We examine claims of prosecutorial error with a revamped standard the Kansas Supreme Court initially outlined in *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). The analytical model first considers whether an error has occurred and then weighs any prejudice to the defendant resulting from the error. Comments made during jury selection, opening statement, or closing argument will be considered error if they fall outside the wide latitude afforded a prosecutor in selecting fair-minded jurors or in discussing the evidence and the law in statements to those jurors. 305 Kan. at 109. This simply transplanted the initial step in the former process, though substituting the term

"error" for "misconduct," a more pejorative label at least connoting a deliberate violation of the rules even when there might be only an inadvertent mistake. 305 Kan. at 104-05.

If an appellate court finds the challenged comments to be prosecutorial error, it must then consider prejudice measured by the test set out in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), for a constitutional wrong. The State, as the party benefiting from the error, must demonstrate "'beyond a reasonable doubt'" that the mistake "'did not affect the outcome of the trial'" taking account of the full trial record. *Sherman*, 305 Kan. at 109 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6). That is, the appellate court must determine if the error deprived the defendant of a fair trial—a constitutional protection rooted both in due process and in the right to trial itself. 305 Kan. at 98-99, 109. The prejudice analysis in *Sherman* replaced a multifactor standard that also considered the prosecutor's bad intent or ill will—breaches of professional conduct the court concluded could be more appropriately addressed in ways other than reversing a conviction in the absence of material prejudice. 305 Kan. at 114-15.

We first consider jury selection. District courts permit the lawyers to question potential jurors to explore for experiences or preconceived notions—a euphemism for biases and prejudices—that might cloud their ability to be fair in the case at hand. See K.S.A. 2020 Supp. 22-3408(3) (lawyers shall be permitted to question potential jurors subject to district court's reasonable restrictions; district court may also examine potential jurors); see also *State v. Hudgins*, 301 Kan. 629, 635, 346 P.3d 1062 (2015) (outlining purpose of selection process and district court's authority to regulate lawyers' questioning of potential jurors). What might be a serious preconception or blind spot for a juror in one case or a type of case might not be in others. The give-and-take necessarily touches on issues and evidence that may arise during the trial, permitting the lawyers to gauge prospective jurors' overt views and more subjective perceptions. The reconnaissance allows the lawyers to challenge potential jurors for legal cause and to use a statutorily allotted number of peremptory strikes to remove remaining candidates who may harbor

14

inhospitable perspectives on a party, a claim, or some aspect of the anticipated evidence. See K.S.A. 22-3410 (identifying grounds supporting challenges for cause); K.S.A. 2020 Supp. 22-3412 (peremptory challenges of prospective jurors). The process is not, however, supposed to be an unvarnished opportunity for the lawyers to inculcate prospective jurors with their spin on the law or the evidence. Some lawyers try to do a great deal of juror "education" in the selection process, but there is an amorphous boundary that shouldn't be crossed.

Spackman submits the prosecutor overstepped with questions to the prospective jurors inquiring how they would feel if they had to come into court and discuss a sexual encounter in front of strangers. He did not raise an objection to the line of inquiry with the district court, but the absence of an objection does not preclude appellate review of possible prosecutorial error. The prosecutor's examination strikes us as falling in the fuzzy area near the boundary line separating proper examination of a jury panel from the improper. The line of questions probed whether the prospective jurors would be uncomfortable in that situation ostensibly (we assume) to assess how they might react to L.S. and M.S. as witnesses. But the questions also inferentially disposed the prospective jurors to put themselves in L.S.'s and M.S.'s position both as witnesses and victims of sex crimes. A prosecutor's suggestion that jurors consider how they would feel or react if they were the victim of the charged crime or a member of the victim's family amounts to an improper argument appealing to their emotions rather than assisting them in fairly assessing the evidence and applying the law to their assessment. See *State v. Lowery*, 308 Kan. 1183, 1208-09, 427 P.3d 865 (2018).

If the prosecutor were concerned about potential juror reaction to children making allegations of wrongdoing generally or of sexual abuse in particular, there were more direct ways of probing the issue without closing in on an improper equation of the prospective jurors and the victims. That said, even if the line of inquiry amounted to prosecutorial error, it was isolated, comparatively subtle, and remote from the jurors'

work in hearing the evidence and rendering their verdicts. Cf. *State v. Boothby*, 310 Kan. 619, 629, 448 P.3d 416 (2019) (district court's misstatement during jury selection both "brief" and "attenuated" from later trial proceedings, resulting in no material prejudice to defendant). This was not an elaborate (and improper) exhortation in closing argument to the jurors just before they began deliberations. See *State v. Genzel*, No. 120,602, 2020 WL 3481499, at *6-7, *11-12 (Kan. App.) (unpublished opinion) (prosecutor's extended pitch in closing argument that jurors needed to protect child alleging sexual abuse because adults around child failed to do so substantially contributed to reversal of conviction), *rev. denied* 312 Kan. 896 (2020). We do not see tangible untoward repercussions for Spackman.

Spackman also complains that during jury selection, the prosecutor said any sex act with a child under 16 years of age is unlawful in Kansas. The remark is technically incorrect. Someone younger than 16 who is married may lawfully engage in consensual sexual activity with his or her spouse. See K.S.A. 2020 Supp. 21-5503(d); K.S.A. 2020 Supp. 21-5506(e). The narrow exception to the prosecutor's general comment about unlawful sexual conduct directed at children had no bearing on this case and never came up during the trial, since Spackman was not married to either L.S. or M.S.

Lawyers are not permitted to misstate the law in their remarks to or in front of jurors. *State v. Tahah*, 302 Kan. 783, 791, 358 P.3d 819 (2015). A prosecutor's misstatement of the law is commonly considered error under the *Sherman* standard. Here, we are, however, inclined to characterize the prosecutor's remark as a mistake but not necessarily prosecutorial error on the notion that a rule of reason should apply to the determination. The remark could be characterized as an overly broad or incomplete generalization that in no way materially misled the prosecutive jurors. But that may be no more than a benign way of describing some errors. To be sure, however, the misstatement was wholly extraneous to the case. Had the prosecutor observed (incorrectly) during jury selection that Kansas no longer criminalizes sodomy between consenting adults of the

16

same sex, although it does, see K.S.A. 2020 Supp. 21-5504(a)(1), we would have a similar situation. Although that part of the sodomy statute is unconstitutional and cannot be enforced, it remains part of the criminal code, so the prosecutor would be technically incorrect about a legal issue having nothing to do with the case. See *State v. Franco*, 49 Kan. App. 2d 924, 934, 319 P.3d 551 (2015) (recognizing K.S.A. 2013 Supp. 21-5504[a][1] to be constitutionally unenforceable).

A rule of reason in assessing prosecutorial error would inject line-drawing when, perhaps, the *Sherman* court intended none, especially as to mistaken statements of legal principles. In *Sherman*, the court focused on the revamped prejudice standard and did not offer a detailed discussion of what amounts to error. At least when it comes to telling jurors what the law is or is not, the test may be binary—a mistaken statement, however trivial or irrelevant, necessarily creates prosecutorial error. We, therefore, assume a categorical rule in this respect and treat the remark as prosecutorial error. Having done so, we are certain the error did not influence the outcome of the trial in any way.

Turning to closing argument, Spackman complains the prosecutor told the jurors that they could convict him of aggravated indecent liberties with a child for his contact with M.S. because she was less than 17 years old. We agree the prosecutor materially misstated the law and committed error. The charge required the jurors to find that M.S. was less than 14 years old when Spackman sexually assaulted her. But we are unpersuaded the single mistaken reference to the age requirement deprived Spackman of a fair trial.

First, the prosecutor's misstatement was not repeated and, at most, amounted to a fleeting reference to a specific age as an element of the crime. Second, the pertinent instruction correctly informed the jurors they had to find M.S. was under 14 years of age to convict Spackman. The district court, of course, read the instructions to the jurors before the lawyers' closing arguments, and the jurors had copies of the instructions to

17

consult during their deliberations. We have no reason to suspect the jurors elevated the isolated remark of the prosecutor over the jury instructions; we, therefore, presume the jurors followed the instructions absent a contrary indication. See *Hachmeister*, 311 Kan. at 513 (appellate courts presume jurors follow instructions given by district court); *State v. Gonzalez*, 307 Kan. 575, 595, 412 P.3d 968 (2018). And the undisputed evidence established M.S. was less than 14 years old when Spackman allegedly abused her. We are convinced the mistake did not deprive Spackman of a fair trial.

Spackman also challenges the prosecutor's comment in closing argument that a forensic sexual assault examination is "not a fun procedure." The prosecutor briefly described the examination, which typically includes physically intrusive probes to recover biological evidence from the victim's body. The description recapitulated testimony from the nurse who examined M.S. The prosecutor's characterization was a single aside that did not appear to be tied to any more fully developed argument to the jurors. We believe we may safely assume most people would agree that such an examination is not fun. In that respect, the comment does not strike us as error.

But Spackman contends the prosecutor sought to elicit sympathy for M.S. by pointing out she had to go through a "not fun" forensic sexual assault examination. The suggestion seems to be stretch. The remark would have been, at best, an exceptionally oblique request for the jurors' undue solicitude. The examination itself had independent relevance in the case, since it generated DNA evidence against Spackman and, thus, was an appropriate topic of discussion in the closing arguments.

On appeal, the State suggests the prosecutor's description of the examination was an argument designed to bolster credibility—M.S. would not have falsely reported a sexual assault because she then would face an intimate, unpleasant physical examination. But the trial record does not show M.S. knew what a sexual assault examination entailed before she accused Spackman. So that justification for the prosecutor's comment doesn't

18

hold up very well. We return to our initial observation that the prosecutor's remark was an accurate characterization of the examination that simply seems to have been dropped into the closing argument in furtherance of no greater or more significant point. As such, it was not prosecutorial error. And if it were, its rather disembodied quality did not compromise Spackman's right to a fair trial.

*Cumulative Error*

Appellate courts may weigh the collective effect of trial errors and grant relief if their overall impact deprived the defendant of a fair hearing even when the errors considered individually would not necessarily require reversal of a conviction. *State v. Harris*, 310 Kan. 1026, 1041, 453 P.3d 1172 (2019); *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). Spackman urges us to do so here and find reversible error. An appellate court should examine the entire trial record to assess multiple trial errors in the aggregate. 301 Kan. at 167-68. The assessment necessarily takes into account "how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence." *State v. Miller*, 308 Kan. 1119, 1176, 427 P.3d 907 (2018). When the heightened review for constitutional error applies to any of the deficiencies—as it does for the prosecutor's misstatement of the law in closing argument—that standard governs the cumulative error analysis. *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020).

The only errors we have found arose in the prosecutor's comments in jury selection and one remark in closing argument. Each of them, at most, presented a nominal or trivial misstatement. As we have already explained, singly there was no reversible error. Without repeating our discussion here, we cannot conclude the errors had a pyramiding effect that amplified their otherwise minimal influence during the trial into a collective erosion of Spackman's right to a fair proceeding. Without gilding the lily, the errors were innocuous individually and assessed together they remained so. We

are persuaded beyond a reasonable doubt that the outcome of the trial would have been the same had those errors never happened.

Affirmed.